

FILED
Jul 18 2018, 8:51 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR THERESA
BIEDRON, SHERRI SITKO, AND
SUSAN ORR

David J. Cutshaw
Kelley J. Johnson
Gabriel A. Hawkins
Cohen & Malad, LLP
Indianapolis, Indiana

ATTORNEYS FOR ANONYMOUS
HOSPITAL

Brian J. Paul
Andrew L. Campbell
Melissa M. Orizondo
Faegre Baker Daniels LLP
Indianapolis, Indiana

ATTORNEYS FOR ANONYMOUS
PHYSICIANS AND ANONYMOUS
MEDICAL PRACTICE

David C. Jensen
Robert J. Feldt
Alyssa Stamatakos
James L. Hough
Eichhorn & Eichhorn, LLP
Hammond, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Theresa Biedron, as the Personal
Representative of the Estate of
Louis Biedron, Deceased,

*Appellant-Respondent,*

and

G. Anthony Bertig, Chairman of
the Medical Review Panel, and

July 18, 2018

Court of Appeals Case No.
45A03-1708-CT-2012

Appeal from the Lake Superior
Court

The Honorable William E. Davis,
Judge

Trial Court Cause No.

Stephen Robertson, as the Commissioner of the Indiana Department of Insurance,

*Third-Party Respondents,*

v.

Anonymous Physician 1, Anonymous Physician 2, Anonymous Medical Practice, and Anonymous Hospital,

*Appellees-Petitioners*

45D05-1701-CT-10

---

Anonymous Hospital, Anonymous Physician 1, Anonymous Physician 2, and Anonymous Medical Practice,

*Appellants-Petitioners,*

v.

Sherri Sitko, as Personal Representative of the Estate of Dorothy Sullivan, Deceased,

*Appellee-Respondent,*

and

G. Anthony Bertig, Chairman of the Medical Review Panel, and Stephen Robertson, as the Commissioner of the Indiana Department of Insurance,

*Third-Party Respondents*

Interlocutory Appeal from the Lake Superior Court

The Honorable Calvin D. Hawkins, Judge

Trial Court Cause No. 45D02-1611-CT-105

Anonymous Hospital,
Anonymous Physician, and
Anonymous Medical Practice,

*Appellants-Petitioners,*

v.

Susan Orr, as Personal
Representative of the Estate of
Patricia Poteet, Deceased,

*Appellee-Respondent,*

and

G. Anthony Bertig, Chairman of
the Medical Review Panel, and
Stephen Robertson, as the
Commissioner of the Indiana
Department of Insurance,

*Third-Party Respondents*

Interlocutory Appeal from the
Lake Superior Court

The Honorable Bruce D. Parent,
Judge

Trial Court Cause No.
45D04-1609-CT-180

**Crone, Judge.**

# Case Summary

[1] Louis Biedron, Dorothy Sullivan, and Patricia Poteet received treatment from

one or two physicians employed by Anonymous Medical Practice ("AMP").[1]

One of the physicians implanted cardiac pacemakers in all three patients at

---

[1] Anonymous Physician 1 in the Biedron lawsuit caption is Anonymous Physician 2 in the Sullivan/Sitko lawsuit caption and Anonymous Physician in the Poteet/Orr lawsuit caption. Anonymous Physician 2 in the Biedron lawsuit caption is Anonymous Physician 1 in the Sullivan/Sitko lawsuit caption. For the sake of clarity, if not consistency, we use abbreviations for the physicians that are appropriate to each lawsuit.

Anonymous Hospital ("AH"). Biedron died almost a year and a half after his surgery; Sullivan died during her surgery; and Poteet died almost a year and three months after her surgery.

[2] Over nine years after Biedron's death, his widow, Theresa Biedron, as the personal representative of his estate, filed a proposed complaint against Anonymous Physician 1 ("AP1"), Anonymous Physician 2 ("AP2"), AMP, and AH (collectively "the Biedron Defendants"), asserting claims for medical malpractice and wrongful death. The Biedron Defendants moved for summary judgment on the basis that the complaint was filed outside the two-year statutory limitation period for those claims. In response, Theresa argued that the period should be tolled by the doctrine of fraudulent concealment, and she submitted a supporting affidavit from a physician. The Biedron Defendants moved to strike the affidavit as not being based on personal knowledge, among other things. The trial court issued a final appealable order granting the Biedron Defendants' motion to strike and motion for summary judgment.

[3] Over seven years after Sullivan's death, her daughter, Sherri Sitko, as the personal representative of her estate, filed a proposed complaint against Anonymous Physician 1 ("AP1"), Anonymous Physician 2 ("AP2"), AMP, and AH (collectively "the Sitko Defendants"), asserting claims for medical malpractice and wrongful death. The Sitko Defendants moved for summary judgment on the basis that the complaint was untimely filed. In response, Sitko argued that the limitation period should be tolled by the doctrine of fraudulent concealment, and she submitted an affidavit from the same physician used by

Theresa. The Sitko Defendants moved to strike the affidavit for largely the same reasons as those asserted by the Biedron Defendants. The trial court issued an order denying the Sitko Defendants' motion to strike and motion for summary judgment and certified its order for interlocutory appeal.

[4] Over seven years after Poteet's death, her daughter, Susan Orr, as personal representative of her estate, filed a proposed complaint against Anonymous Physician ("AP"), AMP, and AH (collectively "the Orr Defendants"), asserting claims for medical malpractice and wrongful death. The Orr Defendants moved for summary judgment on the basis that the complaint was untimely filed. In response, Orr argued that the limitation period should be tolled by the doctrine of fraudulent concealment and submitted an affidavit from the same physician used by Theresa and Sitko. Orr also argued that the medical malpractice statute of limitations was unconstitutional as applied. The Orr Defendants filed a reply and a motion to strike the affidavit. Orr filed a motion to strike the Orr Defendants' reply, claiming that it raised issues not raised in their summary judgment motion. The trial court issued an order denying the Orr Defendants' motion to strike and motion for summary judgment and granting Orr's motion to strike and certified its order for interlocutory appeal.

[5] This Court ultimately consolidated all three appeals. In the first appeal, Theresa argues that the trial court erred in granting the Biedron Defendants' motion for summary judgment on her wrongful death claims. In the second appeal, the Sitko Defendants argue that the trial court erred in denying their motion to strike and motion for summary judgment. And in the third appeal,

the Orr Defendants argue that the trial court erred in granting Orr's motion to strike and in denying their motion to strike and motion for summary judgment. We rule in favor of the defendants in all respects and therefore affirm in part and reverse in part.

## Facts and Procedural History (Biedron)[2]

Biedron was born in 1931. In February 2004, he was diagnosed with congestive heart failure and was evaluated by AP1. According to AP1's treatment notes, "The need to insert a biventricular pacemaker [was] discussed. The risks, options and benefits of the procedure [were] thoroughly outlined, and questions were answered. The patient was agreeable to this, and therefore, directly admitted to [AH] on February 19, 2004." Biedron Appellant's App. Vol. 2 at 174. AP1 implanted a cardiac pacemaker ("CRT-P"), and Biedron was released from AH. In February 2005, after complaining of shortness of breath and swelling in his lower extremities, Biedron was treated at AH by AP2. On July 31, 2005, Biedron was found unresponsive and taken to AH, where cardiopulmonary resuscitation was attempted, but he died from what was diagnosed as cardiopulmonary arrest. His death certificate lists the causes of death as congestive heart failure and cirrhosis of the liver.

---

[2] We heard oral argument on June 1, 2018, at the French Lick Resort as part of the Indiana State Bar Association's Solo & Small Firm Conference. We thank the ISBA for facilitating the argument, and we thank counsel for their capable advocacy.

[7] In October 2014, Biedron's widow Theresa, as personal representative of his estate, filed a proposed complaint for medical malpractice against the Biedron Defendants with the Indiana Department of Insurance ("IDOI").[3] The proposed complaint asserted malpractice claims based on AP1's implantation of a CRT-P instead of a cardiac pacemaker with a defibrillator ("CRT-D") and performance of unnecessary procedures such as stress tests and cardiac angiograms, as well as on various acts or omissions of the other Biedron Defendants, that allegedly resulted in Biedron's wrongful death. More specifically, the proposed complaint asserted a claim of malpractice against AP2 (apparently based on his knowledge that Biedron should have received a CRT-D), a claim against AMP based on the acts and omissions of AP1 and AP2 and other employees, and a claim against AH based on its negligent granting of credentials and privileges to AP1 and AP2.

[8] The Biedron Defendants filed a petition for preliminary determination[4] and a motion for summary judgment, asserting that both the medical malpractice and the wrongful death claims were untimely filed. *See* Ind. Code §§ 34-18-7-1 (medical malpractice tort claim may not be brought unless filed within two years after date of alleged malpractice) and 34-23-1-1 (wrongful death claim shall be commenced by personal representative of decedent within two years of

---

[3] G. Anthony Bertig, the medical review panel's chairman, and Stephen Robinson, IDOI's commissioner, were joined as third-party respondents in this case and the two other cases on appeal.

[4] Indiana Code Section 34-18-11-1 provides for the preliminary determination of an issue of law or fact that is not reserved for written opinion by the medical review panel under Indiana Code Section 34-18-10-22.

date of death); *see also Ellenwine v. Fairley*, 846 N.E.2d 657, 664-65 (Ind. 2006) (for adult victim of medical malpractice who dies within two years of occurrence of malpractice, (1) if death was caused by malpractice, malpractice claim terminates at patient's death, and wrongful death claim must be filed within two years of occurrence of malpractice; (2) if death was caused by something other than malpractice, malpractice claim must be filed within two years of occurrence of malpractice, and any wrongful death claim must be filed within two years of date of death).

[9]     In response, Theresa argued that the statutory limitation period should be tolled by the doctrine of fraudulent concealment, and she designated the affidavit of Dr. Nadim Nasir, Jr., which reads in pertinent part as follows:[5]

> 2. I have reviewed the medical records relative to AP1's treatment of the patient, Louis Biedron.
>
> 3. AP1 fell below the applicable standard of care for the following reasons:
>
> a) Implanting a CRT pacemaker in the patient when the patient, in fact, needed a CRT Defibrillator – a device that would have saved the patient's life. At the time the CRT pacemaker was implanted, the patient had been diagnosed with Congestive Heart Failure and had an Ejection Fraction of less than 35% and had a prolonged QRS interval of > 120 msec. This patient met the criteria for implantation of a CRT-defibrillator; however, AP1

---

[5] Paragraph 1 of the affidavit describes Dr. Nasir's education, training, and experience, which are not at issue. We have replaced references to the Biedron Defendants' names where necessary, and we have done likewise with the defendants' names in the other affidavits excerpted below.

did not have defibrillator privileges; hence AP1 implanted a suboptimal device. By 2004, it was standard of care to place CRT[-]ICD and to limit implantation of CRT Pacemakers to patients who did not desire the additional life-saving benefits of the Implantable Cardioverter Defibrillator part of the CRT-ICD. AP1 failed to disclose this reasonable and more appropriate alternatives [sic] to the CRT[-]PPM, this disclosure would be mandatory for obtaining proper consent.

b) Failing to disclose alternatives violated the standard of care for obtaining proper consent wherein risks, benefits and alternatives of a procedure are discussed. This breach of duty was predicated on AP1's desire to recommend a procedure which he could perform for financial gain, rather than refer the patient to an Electrophysiologist for an expert evaluation of the patient's condition and CRT-ICD implantation. At that time, AP1 did not have privileges for ICD implantation at AH. The failure of AP1 to either properly inform Mr. Biedron on appropriate options or to refer him to the appropriate expert ultimately cost Louis Biedron his life.

4. AP2 fell below the standard of care when he continued with this facade in February of 2005 knowing that the pacemaker was inadequate therapy for this patient who instead needed a defibrillator, the prevailing standard of care nationally at that time. AP2 knowingly supported the negligent care and plan of action authored by AP1 rather than referring Mr. Biedron to a board certified Cardiac Electrophysiologist. If he did not know that ICD was the standard of care for Mr. Biedron, then he breached the standard of care due to his ignorance of this standard.

5. Having consciously hidden the alternative of a CRT[-]ICD, AP1 violated his duty to Mr. Biedron by withholding this option. Absent a full disclosure of the options available to him, neither Mr. Biedron nor any lay person could know that a pacemaker was not the appropriate device for his condition. Neither Mr.

Biedron nor any lay person could know that he met the criteria for the implantation of a defibrillator. Mr. Biedron would have no idea or consideration that his doctor intentionally withheld vital life-saving options of therapy, and that this lie of omission was driven by financial motivations and not Mr. Biedron's best interests nor that his doctor did not have the credentials for a defibrillator implantation. A lay person would not know that he needed the referral to a Cardiac Electrophysiologist for expert evaluation in order to implant the appropriate life-saving device.

Biedron Appellant's App. Vol. 2 at 142-44.

[10] The Biedron Defendants filed a motion to strike Dr. Nasir's affidavit that reads in relevant part as follows:

1. The affidavit of Dr. Nasir is not admissible evidence as to the only issue present in the current Petition for Preliminary Determination, namely, the application of the statute of limitations to [Theresa's] claim.

2. In Dr. Nasir's affidavit an attempt is made to inject the issue of whether [AP1 and AP2] complied with the standard of care. This issue has no bearing on whether the proposed complaint was timely filed. Further, the affidavit purports to summarize conversations [AP1 and AP2] had with Mr. Biedron, even though Dr. Nasir was not present, at any time, during Mr. Biedron's treatment. Therefore, Dr. Nasir has no personal knowledge regarding the interaction between Mr. Biedron and either [AP1 or AP2]. For these reasons, Dr. Nasir's affidavit must be stricken.

….

7. Further, Dr. Nasir's affidavit violates [Indiana Evidence Rule]

704(b) because Dr. Nasir testified to statements regarding the state of mind of [AP1 and AP2 and Biedron], and regarding the truth or falsity of allegations.… In paragraph 5, Dr. Nasir testified about what "[a] lay person would not know." But in this case, it is the knowledge of Mr. Biedron at issue, not an unnamed, average "lay person" that is relevant. Dr. Nasir did not – and cannot – offer opinions as to what Mr. Biedron knew or did not know. Rather his assertion about what "lay people" would know, or not know, is similarly speculative, without proper foundation, and inadmissible.

8. [Theresa] also uses Dr. Nasir's affidavit to incorrectly equate a violation of the standard of care with fraud. These two concepts are unrelated. There is no case law that permits this Court to find fraudulent concealment based upon expert testimony regarding the standard of care.

*Id*. at 220-24.

[11] In August 2017, after a hearing on all pending motions, the trial court issued a final appealable order that reads in pertinent part as follows:

Upon review of the supporting documents, relevant case and statutory law, the Court now grants the petitions [for preliminary determination] and dismisses the claim of the Respondent/Plaintiff Theresa Biedron as personal representative of the Estate of Louis Biedron, deceased.

The pertinent parts of the affidavit of Dr. Nasir relating to the issues on the summary judgment are inadmissable [sic] comments on the Petitioner/Defendants Doctors' truthfulness and not on facts that would indicate concealment or fraud. The affidavit concerning these issues is ordered stricken.

The Summary Judgment as to the complaint before the

malpractice board is beyond the statute of limitations and should be dismissed. The claim for wrongful death likewise is beyond the statute of limitations and should also be dismissed.

Biedron Appealed Order at 1-2.

Theresa now appeals the trial court's summary judgment ruling on her wrongful death claims and focuses her arguments solely on AP1's alleged negligence, thereby implicitly conceding that her claims against the remaining defendants are purely derivative. She does not challenge the trial court's ruling on the Biedron Defendants' motion to strike Dr. Nasir's affidavit.

## Discussion and Decision (Biedron)

## Section 1 – The trial court did not err in granting the Biedron Defendants' summary judgment motion.

The sole pertinent issue in this case is whether the trial court erred in granting the Biedron Defendants' summary judgment motion on Theresa's wrongful death claims. We review a summary judgment ruling de novo. *Broadbent v. Fifth Third Bank*, 59 N.E.3d 305, 310 (Ind. Ct. App. 2016), *trans. denied*. "A party seeking summary judgment bears the burden to make a prima facie showing that there are no genuine issues of material fact and that the party is entitled to judgment as a matter of law." *Id*. "Once the moving party satisfies this burden through evidence designated to the trial court, the non-moving party may not rest on its pleadings, but must designate specific facts demonstrating the existence of a genuine issue for trial." *Id*. at 311. Mere speculation is insufficient to create a genuine issue of material fact to defeat

summary judgment. *Beatty v. LaFountaine*, 896 N.E.2d 16, 20 (Ind. Ct. App. 2008), *trans. denied* (2009).

[14] "Our review of a summary judgment motion is limited to those materials designated to the trial court." *City of Bloomington v. Underwood*, 995 N.E.2d 640, 644 (Ind. Ct. App. 2013), *trans. denied* (2014). "[W]e construe the evidence in a light most favorable to the non-moving party and resolve all doubts as to the existence of a genuine factual issue against the moving party." *Broadbent*, 59 N.E.3d at 310. A trial court's findings and conclusions on summary judgment are helpful in clarifying its rationale, but they are not binding on this Court. *Whitley Cty. Teachers Ass'n v. Bauer*, 718 N.E.2d 1181, 1186 (Ind. Ct. App. 1999), *trans. denied* (2000). We are not constrained to the claims and arguments presented to the trial court, and we may affirm a grant of summary judgment on any theory supported by the designated evidence. *Manley v. Sherer*, 992 N.E.2d 670, 673 (Ind. 2013). The party that lost in the trial court has the burden of persuading us that the trial court erred. *Underwood*, 995 N.E.2d at 644.

[15] "The statute of limitations defense is particularly suitable as a basis for summary judgment." *Myers v. Maxson*, 51 N.E.3d 1267, 1276 (Ind. Ct. App.

2016), *trans. denied*.[6] A plaintiff need not anticipate a statute of limitations defense and plead matters in avoidance in the complaint. *Bellwether Props., LLC v. Duke Energy Ind., Inc.*, 87 N.E.3d 462, 466 (Ind. 2017). But when the party moving for summary judgment "asserts the statute of limitations as an affirmative defense and establishes that the action was commenced beyond the statutory period, the burden shifts to the nonmovant to establish an issue of fact material to a theory that avoids the defense." *Myers*, 51 N.E.3d at 1276.

[16] The Biedron Defendants established that Theresa's wrongful death action was commenced well beyond the two-year statutory period that ended, at the latest, on July 31, 2007, two years after Biedron's death. Theresa asserts that the period should be tolled by the doctrine of fraudulent concealment, and she designated Dr. Nasir's affidavit to establish an issue of fact material to that theory.

[17] Under the doctrine of fraudulent concealment, "a person is estopped from asserting the statute of limitations as a defense if that person, by deception or violation of a duty, has concealed material facts from the plaintiff and thereby

---

[6] Strictly speaking, Indiana Code Section 34-23-1-1 is a nonclaim statute, rather than a statute of limitation. *Alldredge v. Good Samaritan Home, Inc.*, 9 N.E.3d 1257, 1264-65 (Ind. 2014). A nonclaim statute creates a right of action if commenced within the statutory period, whereas a statute of limitation creates a defense to an action brought after the expiration of the statutory period. *In re Paternity of M.G.S.*, 756 N.E.2d 990, 997 (Ind. Ct. App. 2001), *trans. denied* (2002). Because the limitation period of either may be tolled by fraudulent concealment, *Alldredge*, 9 N.E.3d at 1264-65, we use the terms interchangeably here. In *Alldredge*, our supreme court held that the fraudulent concealment statute (Indiana Code Section 34-11-5-1) may apply to toll the limitation period for a wrongful death action. *Id*. All three plaintiffs, who did not invoke the statute below, argue that the common law doctrine of fraudulent concealment may also toll that limitation period. The defendants do not disagree.

prevented discovery of a wrong." *Boggs v. Tri-State Radiology, Inc.*, 730 N.E.2d 692, 698 (Ind. 2000). "There are two types of fraudulent concealment, active and passive." *GYN-OB Consultants, LLC v. Schopp*, 780 N.E.2d 1206, 1210 (Ind. Ct. App. 2003), *trans. denied*. "Passive or constructive concealment may be merely negligent and arises when the physician does not disclose to the patient certain material information." *Id*. "'The physician's failure to disclose that which he knows, or in the exercise of reasonable care should have known, constitutes constructive fraud.'" *Id*. (quoting, inter alia, *Cyrus v. Nero*, 546 N.E.2d 328, 330 (Ind. Ct. App. 1989)). Where the concealment is passive, the statute of limitations begins to run when the patient-physician relationship ends, or until the discovery of the malpractice, whichever is earlier. *Schopp*, 780 N.E.2d at 1210.

[18] "Active concealment involves affirmative acts of concealment intended to mislead or hinder the plaintiff from obtaining information concerning the malpractice." *Id*. "[T]here must be some affirmative act which amounts to more than passive silence." *French v. Hickman Moving & Storage*, 400 N.E.2d 1384, 1389 (Ind. Ct. App. 1980). The plaintiff must establish that the defendant's concealment of material information somehow prevented her from inquiring into or investigating the plaintiff's (or decedent's) condition, thus preventing her from discovering a potential cause of action. *Garneau v. Bush*, 838 N.E.2d 1134, 1143 (Ind. Ct. App. 2005), *trans. denied* (2006). When active concealment is involved, the statute of limitations does not expire until a

reasonable time after the plaintiff discovers or with reasonable diligence could have discovered the existence of the malpractice. *Schopp*, 780 N.E.2d at 1210.

[19] Theresa concedes that a constructive concealment claim would be fruitless because Biedron's relationship with AP1 ended at his death in 2005. She characterizes AP1's advice to Biedron as active concealment, claiming that

> [AP1] did not simply engage in passive silence by failing to inform [Biedron] that he needed a CRT-D. Rather, [AP1] affirmatively misrepresented the "need" for a CRT-P and, in so doing, failed to alert [Biedron] that a CRT-P is only intended for patients who do not desire the life-saving benefits of a CRT-D. Having no idea that he received the wrong device as a result of [AP1's] indication that he was receiving the "needed" device, [AP1] not only led [Biedron] to his death but cloaked the malpractice surrounding the impropriety of his failure to refer [Biedron] to an electrophysiologist with privileges to implant a CRT-D.

Biedron Appellant's Br. at 15 (citing Biedron Appellant's App. Vol. 2 at 142).

[20] A critical flaw in Theresa's argument is that Dr. Nasir had no personal knowledge of what AP1 actually told Biedron about the CRT-P. Indiana Trial Rule 56(E) provides that affidavits designated in support of or opposition to summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." "The requirements of Trial Rule 56(E) are mandatory and a court considering a motion for summary judgment should disregard inadmissible information contained in

supporting or opposing affidavits." *Morris v. Crain*, 71 N.E.3d 871, 877 (Ind. Ct. App. 2017). Accordingly, the trial court should have disregarded Dr. Nasir's statements regarding matters of which he had no personal knowledge, including AP1's intent and state of mind, what Biedron knew, and what AP1 actually told Biedron about the CRT-P.[7] *See Weaver v. State*, 643 N.E.2d 342, 345 (Ind. 1994) (noting that witnesses may not testify to opinions concerning intent under Ind. Evidence Rule 704(b), which is consistent with prior common law rule "that a witness may not give an opinion as to the state of mind or the thought processes of another person."); *Houser v. Kaufman*, 972 N.E.2d 927, 936 (Ind. Ct. App. 2012) (declining to assume for purposes of summary judgment that content of physician's notes was repeated verbatim to patient), *trans. denied*.[8]

[21] Theresa argues that AP1's state of mind may be established by inference, claiming that his lack of hospital privileges to implant a CRT-D suggests that he "had a financial motive to perform the improper implant of a CRT-P rather than refer [Biedron] to a physician with CRT-D privileges." Biedron Appellant's Br. at 17. But absent any designated evidence regarding what AP1 actually told Biedron about the CRT-P, Theresa can only speculate that AP1

---

[7] The physician and medical practice defendants in all three cases note that the patients signed consent forms prior to their implant surgeries, and that if a consent is properly signed and witnessed and properly explained to the patient before a procedure is undertaken, "a rebuttable presumption is created that the consent is an informed consent." Ind. Code § 34-18-12-2. The plaintiffs point out that "causes of action predicated upon a lack of informed consent are distinct from actions arising from an unnecessary surgery." Sitko/Orr Appellees' Br. at 33-34.

[8] In her reply brief, Theresa asserts that vestiges of Dr. Nasir's affidavit survived the Biedron Defendants' motion to strike. Because she did not challenge the trial court's ruling in her initial brief, she has waived any argument in this regard.

affirmatively misled Biedron about his need for the device. "[M]ere speculation cannot create questions of fact." *Beatty*, 896 N.E.2d at 20.

[22] And even assuming that AP1 affirmatively misled Biedron about his need for a CRT-P, Theresa has failed to establish that this prevented her from investigating Biedron's condition. As AH points out, Theresa could have requested Biedron's medical records after his death in 2005, and they would have revealed the same information that she now relies on to assert that AP1 committed malpractice by implanting a CRT-P instead of a CRT-D. The only "concealed" evidence that came to light after Biedron's death was AP1's alleged financial motive to commit malpractice, which is irrelevant to our analysis because the concealment did not prevent Theresa from investigating Biedron's condition. Because Theresa has failed to establish an issue of fact material to her fraudulent concealment theory, we affirm the trial court's entry of summary judgment for the Biedron Defendants.

## Facts and Procedural History (Sitko)

[23] Sullivan was born in 1932. In 2008, she received unspecified care and treatment from AP1. On February 13, 2008, AP2 inserted a cardiac stent in one of Sullivan's arteries. On February 19, 2008, AP2 recommended that Sullivan receive a CRT-D. The next day, Sullivan died during the CRT-D implantation surgery, which AP2 performed at AH. Her death certificate lists her cause of death as congestive heart failure due to or as a cause of severe coronary artery disease. Sitko/Orr Appellants' App. Vol. 2 at 102.

[24]     Over seven years later, on May 15, 2015, Sitko, as the personal representative of Sullivan's estate, filed a proposed complaint for medical malpractice against the Sitko Defendants with the IDOI. The proposed complaint asserted general claims of medical malpractice against AP1 and AP2, a claim against AMP based on the negligence of AP1 and AP2, and a claim against AH for the negligent credentialing, privileging, and policing of AP1 and AP2. It also asserted claims for wrongful death or, in the alternative, claims for personal injury that allegedly survived Sullivan's death pursuant to Indiana Code Section 34-9-3-1.[9]

[25]     In 2016, the Sitko Defendants filed a petition for preliminary determination and a motion for summary judgment, asserting that Sitko's claims were untimely filed. In response, Sitko argued that the statutory limitation period should be tolled by the doctrine of fraudulent concealment, and she designated an affidavit from Dr. Nasir that reads in pertinent part as follows:

>      2. I have reviewed the medical records relative to AP2's treatment of the patient, Dorothy Sullivan.
>
>      3. AP2 fell below the applicable standard of care for the following reasons:
>
>      a) AP2 recommended and implanted a defibrillator just several

---

[9] Indiana Code Section 34-9-3-1(a) provides that if an individual who is entitled to a cause of action dies (with certain exceptions not relevant here), the cause of action survives and may be brought by the deceased party's representative. "The action is considered a continued action and accrues to the representatives or successors at the time the action would have accrued to the deceased if the deceased had survived." Ind. Code § 34-9-3-1(b). The limitation period for a personal injury action is two years. Ind. Code § 34-11-2-4(a).

days after performing a stent on the proximal Left Anterior Descending Artery (LAD). The performance of an Implantable Cardioverter Defibrillator (ICD) for primary prevention of Sudden Cardiac Death within 90 days of a revascularization procedure is outside the standard of care and exhibits either a willful disregard of established Medical Practice and Standards or it exhibits a lack of appropriate intellectual fund of knowledge, either of which resulted in a procedure which was inappropriate, not indicated and below the standard of care and which proximately led to her death during that implantation.

b) Notwithstanding the improper recommendation and implantation of an ICD, AP2 further aggravated his substandard care by improperly recommending a Cardiac Resynchronization Therapy Defibrillator (CRT-D) device on 02/19/08 when the patient had a narrow QRS duration via EKG findings on 02/07/08 (QRS 97 msec) and 02/10/08 (QRS 92 msec). The rules, recommendations, guidelines and established medical practice of placing a CRT-D require a QRS duration equal to or greater than 120 milliseconds (msec) and disallows the implantation of a CRT-D device absent this criteria. Furthermore the patient must also qualify for an ICD. Mrs. Sullivan as previously noted did not qualify for an ICD because of her recent revascularization procedure on her LAD and her Myocardial Infarction which was much more likely than not less than 40 days old (see section c. below) and she certainly did not require a CRT[-]D (which differs from a regular ICD by placement of the LV lead, which in this case proximately led to her death from probably cardiac tamponade. (see below)

c) Moreover in his signed Indications for ICD Therapy sheet (an administrative form provided by AH to justify device implantation) in the Hospital record AP2 affirmed and signed his name to that document that the patient had LV (left ventricular) dysfunction due to a prior MI (myocardial infarction), AND that at least forty (40) days had passed after the MI and the patient's LVEF (left ventricular ejection fraction) was less than or equal to

40%. The evidence in the medical record reveals a gross and negligent error in his judgment that the MI was more than 40 days old.

Mrs. Sullivan presented with a 1 week history of symptoms and had EKG evidence of recent transmural myocardial infarction (MI). There was additional substantial objective evidence that her MI was recent based on the Electrocardiograms 2/07/2008 and subsequent evolutionary changes on later EKGs and the Echocardiogram performed on 2/10/2008 showing normal Left Ventricular (LV) size (aged MI more than 40 days old due to LAD disease generally would have Left Ventricular enlargement yet her LV was normal in size. Hence AP2 negligently failed to even reasonably establish the timing of the MI and further violated the standard of care when recommended the ICD within the 40 day window of exclusion. Further supporting a recent diagnosis of myocardial infarction was normal LV wall thickness. Remodeling of LV geometry and wall thickness after myocardial infarction occurs in the time frame remote from MI and results in thinning of the affected infarcted muscle in addition to expansion of the LV as stated herein.

d) Hence AP2's recommendation for an ICD fell below the standard of care on not one but two necessary criteria, i) implantation within 90 clays of revascularization ii) implantation within 40 days of acute MI (AMI).

e) There is no indication that [sic] in the medical records that AP2 disclosed to the patient or subsequently her estate that the device he recommended and implanted on 02/20/08 was not necessary or indicated in light of the aforementioned required criteria for implantation of an ICD and in light of her narrow QRS and in light of the fact the ACC/AHA Implant Guidelines indicate that either an ICD or CRT (cardiac resynchronization therapy) device should not be implanted within ninety (90) days of revascularization or within 40 days of an acute MI.

4. AP2 improperly represented to the patient that she needed a CRT-D implant when she did not meet indications for such a device, either an ICD or a CRT-ICD as herein stated because she did not qualify for multiple reasons (see above).

5. AP2 further fell below the standard of care during the implantation of the unnecessary ICD. Mrs. Sullivan had no pericardial effusion on February 10, 2008. During the implantation of the inappropriate ICD, more specifically during placement of the LV lead Mrs. Sullivan becomes progressively bradycardic and arrests. A stat Echo was done showing an important pericardial effusion. AP2 failed to competently address this life threatening complication and falls below the standard of care in 2 respects:

i) his inability to recognize that he much more likely than not caused a tear in the cardiac venous anatomy leading to the immediate accumulation of the effusion and the resultant cardiac tamponade.

ii) his inability to perform a competent pericardiocentesis to relieve the blood in the pericardial sac and by doing so relieve compressive pressure on the heart to permit adequate filling and pumping of blood and restore spontaneous circulation further show his lack of proper education and training in the performance and management of complications of ICD/CRT [-]D implantation.

6. The average person laying [sic] ill in the hospital has an expectation that their doctor will recommend appropriate options for diagnosis and treatment. The average person would not suspect that their doctor would recommend, nor the hospital permit inappropriate and unnecessary surgeries. A lay person would not know that an ICD was unnecessary for the reasons stated above nor that the patient's EKG QRS duration was essentially normal and that the totality of these conditions did not qualify her for either an ICD or a CRT-D. A lay person would

not and could not know that the ACC/AHA Implant Guidelines nor Medicare Payment guideline did not permit implantation of an ICD for primary prevention in this patient or any patient until forty days post-MI and/or until ninety days post-revascularization (i.e., cardiac vessel stenting). Frankly most people expect their doctors to be competent and honest and have the patient's best interest at heart therefore there would be no expectation that either Mrs. Sullivan or her estate should have known that AP2 breeched [sic] the standards of care in his negligent recommendations and that AH negligently credentialed AP2.

Sitko/Orr Appellants' App. Vol. 3 at 22-28.[10]

[26] The Sitko Defendants filed a motion to strike Dr. Nasir's affidavit based on his lack of personal knowledge as to what AP2 told Sitko, his statements regarding AP2's state of mind, his conflation of negligence and fraud, and his speculation regarding what a lay person would know, among other things. After a hearing, the trial court issued an order summarily denying the Sitko Defendants' motion for summary judgment and motion to strike and certified the order for interlocutory appeal. Sitko concedes that her submission of Dr. Nasir's affidavit opining that Sullivan's death was caused by AP2's allegedly unnecessary surgery prevents her from pursuing a survival action, and thus she is pursuing only her wrongful death claims.

---

[10] The affidavit contains additional assertions regarding AH that are irrelevant to this appeal.

# Discussion and Decision (Sitko)

## Section 2 – The trial court abused its discretion in denying the Sitko Defendants' motion to strike Dr. Nasir's affidavit.

[27] We first address the Sitko Defendants' argument that the trial court erred in denying their motion to strike Dr. Nasir's affidavit. A trial court has broad discretion in ruling on the admissibility of evidence, which extends to rulings on motions to strike affidavits on the grounds that they do not comply with the summary judgment rules. *Morris*, 71 N.E.3d at 877. A trial court abuses its discretion when its decision is clearly against the logic and effect of the facts and circumstances before it. *Id.*

[28] The Sitko Defendants argue, and we agree, that the affidavit contains inadmissible statements regarding matters outside Dr. Nasir's personal knowledge, such as the conversations between AP2 and Sullivan, as well as inadmissible statements regarding their intent, state of mind, and knowledge. Ind. Trial Rule 56(E); Ind. Evidence Rule 704(b). Therefore, we conclude that the trial court abused its discretion in denying the Sitko Defendants' motion to strike those portions of Dr. Nasir's affidavit.

[29] The Sitko Defendants also take issue with Dr. Nasir's assertions of negligence, claiming that this issue is reserved for the medical review panel and irrelevant to fraudulent concealment. Sitko argues that to establish fraudulent concealment, she must demonstrate that AP2's "representations were inaccurate, and expert medical testimony is necessary to establish such misrepresentations."

Sitko/Orr Appellees' Br. at 51. But Dr. Nasir's assertions of negligence based on AP2's alleged errors in judgment or lack of skill/training/knowledge are not affirmative acts of concealment that prevented Sitko from investigating Sullivan's condition. Accordingly, we conclude that the trial court abused its discretion in failing to strike those portions of the affidavit as well.

## Section 3 – The trial court erred in denying summary judgment to AP1.

[30] The Sitko Defendants also assert that Sitko designated no evidence to support a tolling claim as to AP1, and therefore API is entitled to summary judgment. Sitko concedes her failure to designate such evidence but contends that the Sitko Defendants failed to alert her to their bases for seeking summary judgment as to AP1 in their initial summary judgment memorandum; she cites to the Orr Defendants' memorandum to support this contention, however. *See* Sitko/Orr Appellees' Br. at 53 (citing Sitko/Orr Appellants' App. Vol. 3 at 109-29). The Sitko Defendants' memorandum notes that more than seven years had passed from the date of their last possible act of alleged malpractice and argues that there was no legal basis for tolling the statutory limitation period. Sitko/Orr Appellants' App. Vol. 2 at 46-47. This was sufficient to alert Sitko to the Sitko Defendants' bases for seeking summary judgment as to AP1, and Sitko designated no evidence to defeat the summary judgment motion. Therefore, we reverse the denial of summary judgment as to AP1.

## Section 4 – The trial court erred in denying summary judgment to the remaining Sitko Defendants.

The remaining Sitko Defendants contend that they are also entitled to summary judgment, claiming that Sitko designated no admissible evidence that AP2's representation to Sullivan about her need for a CRT-D was an affirmative misrepresentation, as opposed to an act of negligence. We agree. Dr. Nasir had no personal knowledge about what AP2 actually told Sullivan, and he had no personal knowledge regarding AP2's intent or state of mind, i.e., whether AP2 intended to mislead Sullivan about her need for a CRT-D or was merely negligent. Sitko notes that her counsel argued at the summary judgment hearing that Sullivan would not have "ended up on the operating table" if AP2 had not lied to her about the necessity of the surgery. Sitko/Orr Appellees' Br. at 39 (quoting Sitko/Orr Tr. Vol. 2 at 24). Counsel's argument is pure speculation, and it is well settled that "the 'unsworn commentary of an attorney' is not competent evidence for a summary judgment motion and should not be considered." *Turner v. Bd. of Aviation Comm'rs*, 743 N.E.2d 1153, 1164 (Ind. Ct. App. 2001) (quoting *Freson v. Combs*, 433 N.E.2d 55, 59 (Ind. Ct. App. 1982)), *trans. denied*. Sitko cites several cases stating that fraud may be inferred from circumstantial evidence, but she cites no authority for the proposition that active fraudulent concealment may be inferred from merely negligent conduct. *Cf. Hughes v. Glaese*, 659 N.E.2d 516, 521 (Ind. 1995) ("[B]y distinguishing the two branches of fraudulent concealment on the basis of whether the physician's concealment was negligent or purposeful, courts can make more appropriate and just determinations as to when defendant

physicians should be prevented from asserting the limitations defense."). We do not hold that such an inference could never be drawn, only that Sitko has failed to designate admissible evidence to support that inference in this case.

[32] And even assuming that AP2 affirmatively misled Sullivan about her need for a CRT-D, Sitko has failed to establish that this prevented her from investigating Sullivan's condition. Sitko could have requested Sullivan's medical records after her death in 2008, and they would have revealed the same information that she now relies on to assert that AP2 committed malpractice. In sum, Sitko has failed to establish an issue of fact material to her fraudulent concealment theory. She makes no separate arguments regarding AMP and AH, thereby implicitly conceding that their liability is purely derivative of AP2's liability. Consequently, we reverse the trial court's denial of the Sitko Defendants' summary judgment motion as to AP2, AMP, and AH.

## Facts and Procedural History (Orr)

[33] Poteet was born in 1936. AP began treating Poteet in 2002 and performed several medical procedures, including the implantation of a carotid stent in October 2005, the implantation of a CRT-D in January 2006, the performance of a left heart catherization coronary angiogram in March 2006, and the performance of a transesophageal echocardiogram in September 2006. On April 24, 2007, Poteet died. Her death certificate lists the cause of death as end stage renal disease.

[34]     Over seven years later, on October 27, 2014, Orr, as personal representative of Poteet's estate, filed a proposed complaint for medical malpractice asserting claims against the Orr Defendants that are similar to those asserted in Sitko's proposed complaint. Orr asserted claims for wrongful death or, in the alternative, claims for personal injury that allegedly survived Poteet's death pursuant to Indiana Code Section 34-9-3-1.

[35]     In 2016, the Orr Defendants filed a petition for preliminary determination and a motion for summary judgment, asserting that Orr's claims were untimely filed. In response, Orr designated an affidavit from Dr. Nasir that reads in pertinent part as follows:

> 2. I have reviewed the Submissions of the parties and [sic] in this case and the medical records relative to AP's treatment of the patient, Patricia Poteet.
>
> 3. AP fell below the applicable standard of care for the following reasons:
>
> a) Improperly evaluating and recommending a CRT-D device on 01/19/06 when the patient had a narrow QRS via EKG findings on 08/23/05 (QRS 89); 10/21/05 (QRS 98); 10/23/05 (QRS 87); 10/24/05 (QRS 97); and 01/19/06, hours before the implant (QRS 83). The standard of care does not permit the implantation of a CRT-D device unless the QRS is equal to or greater than 120 ms;
>
> b) Misstating in his Operative Note that the patient's QRS was 130 apparently attempting to justify this unnecessary implant;
>
> c) Subjecting the patient to unnecessary diagnostic procedures and misstating indications for those procedures or otherwise

repeating tests that were completed shortly before the tests.

4. AP improperly represented to the patient that she needed a CRT-D implant when she did not meet the indications for such a device, as her QRS was essentially normal.

5. A lay person would not know that this device was unnecessary or that AP misstated the patient's QRS in the Procedure Note relative to the CRT-D implantation.

6. After reviewing documents relative to the negligent credentialing claim, AH concealed from the public (and from this patient) that AP was not qualified to evaluate, treat, implant CRT-D devices, or follow the patient after the implantation. AH also concealed from the public and this patient that AP was improperly granted privileges for ICD's and CRT-D's. A CRT-D device was implanted in this patient.

Sitko/Orr Appellants' App. Vol. 8 at 40-41. Orr argued that the statutory limitation period for her wrongful death claims should be tolled by the doctrine of fraudulent concealment or, in the alternative, that the statutory limitation period for her medical malpractice claims was unconstitutional as applied.

[36] The Orr Defendants filed a reply to Orr's response and a motion to strike Dr. Nasir's affidavit, which is substantially similar to the foregoing motions to strike. Orr filed a motion to strike portions of the Orr Defendants' reply on the basis that "multiple new issues" were raised therein. *Id*. at 76. Without holding a hearing, the trial court issued an order denying the Orr Defendants' motion to strike on the basis that Dr. Nasir's affidavit "demonstrated that he was competent to testify on the matters contained therein, that the facts he swore to

were admissible, relevant, and were necessary to understand the nature of the malpractice alleged." Orr Appealed Order at 2. The trial court also denied the Orr Defendants' summary judgment motion on the basis that Dr. Nasir's affidavit "invoked enough doubt … to properly preserve the issue of equitable tolling as appropriate to the present facts and, in doing so, also precluded summary judgment on the issue of a statute of limitations violation." *Id*. at 4. Finally, the trial court granted Orr's motion to strike those portions of the Orr Defendants' reply that "injected issues argued for the first time, thus preventing those issues from being countered within the adversary process." *Id*. at 2. The trial court certified the order for interlocutory appeal.

## Discussion and Decision (Orr)

## Section 5 – The trial court abused its discretion in striking the Orr Defendants' reply briefs.

[37] In Orr's motion to strike, she asserted that the Orr Defendants improperly argued for the first time in their summary judgment reply brief that granting summary judgment for AP would require granting summary judgment for AMP because no independent claims of malpractice had been made against AMP. On appeal, the Orr Defendants contend that "[t]his is simply not true" because they "demonstrated in their original [summary judgment] motion and brief that Orr's claim against AMP included allegations of *respondeat superior* for the treatment rendered by [AP] and that the claims against both [AP] and [AMP] would be time-barred." Sitko/Orr AP1/AP2/AMP Appellants' Br. at 42. The record indicates that the Orr Defendants excerpted Orr's allegations

against AP and AMP in her proposed complaint but did not make the specific argument later made in their reply brief. It is clear from the face of Orr's complaint, however, that she did not assert a separate basis of liability for AMP.

[38]  Orr also asserted that the Orr Defendants improperly argued for the first time in their reply brief that AP's "fraud amounted to no more than passive silence." Sitko/Orr Appellants' App. Vol. 8 at 77. But this argument was a rejoinder to Orr's argument in her response brief that AP "not only misrepresented the need for a CRT-D implant but also affirmatively misrepresented Poteet's QRS duration." *Id*. at 31. Contrary to Orr's assertion in her motion to strike, the Orr Defendants were not required to raise the elements of fraud in their summary judgment motion; their only burden was to establish that Orr's claims were untimely. *Myers*, 51 N.E.3d at 1276.[11] Thus, the Orr Defendants' argument in their reply brief was a proper response to Orr's argument regarding fraudulent concealment. Based on the foregoing, we conclude that the trial court abused its discretion in striking the Orr Defendants' reply briefs.

## Section 6 – The trial court abused its discretion in denying the Orr Defendants' motion to strike Dr. Nasir's affidavit.

[39]  The Orr Defendants' arguments regarding the denial of their motion to strike Dr. Nasir's affidavit are similar to (and indeed are largely lumped in with) those

---

[11] We acknowledge that Orr mentioned fraudulent concealment in her proposed complaint and that the Orr Defendants followed suit in their initial summary judgment brief, but neither was obligated to do so.

of the Sitko Defendants. One wrinkle in this case is Dr. Nasir's observation that Poteet's QRS reading in her EKG is different from the QRS reading in AP's operative notes, which Orr asserts is indicative of an intent to mislead. AH points out, however, that Poteet's medical records "may establish what [AP] wrote down about her QRS duration," but they do "not establish what he communicated to her about her QRS duration." Sitko/Orr AH Appellant's Br. at 31. Nor do they establish what AP actually told Poteet about her need for a CRT-D. Therefore, we conclude that the trial court abused its discretion in denying the Orr Defendants' motion to strike Dr. Nasir's statements regarding matters outside his personal knowledge.

## Section 7 – The trial court erred in denying summary judgment on Orr's wrongful death claims on the issue of fraudulent concealment.

[40] The Orr Defendants' arguments regarding fraudulent concealment are also similar to those of the Sitko Defendants. The operative facts of the two cases are sufficiently similar to compel a similar result. Orr's proposed complaint suggests that AP had a concealed financial motive to mislead Poteet about the need for a CRT-D; as in the Biedron case, the concealment of AP's motive to mislead is irrelevant to our analysis because it did not prevent Orr from investigating Poteet's condition. Consequently, we reverse the denial of the Orr Defendants' summary judgment motion on the issue of fraudulent concealment, which disposes of Orr's wrongful death claims.

## Section 8 – The trial court erred in denying summary judgment on Orr's medical malpractice claims.

[41]     Finally, we must also determine if a genuine issue of material fact exists regarding whether the two year-limitation period of Indiana Code Section 34-18-7-1 is unconstitutional as applied to Orr's medical malpractice claims. Section 34-18-7-1 "is an 'occurrence' statute as opposed to a 'discovery' statute." *Brinkman v. Bueter*, 879 N.E.2d 549, 553 (Ind. 2008). "Because this statutory time limit begins to run upon the occurrence of the alleged malpractice, without regard to the date of actual or constructive discovery of injury or malpractice by a person sustaining harm, literal application of the statute has been found unconstitutional in certain situations." *Booth v. Wiley*, 839 N.E.2d 1168, 1170-71 (Ind. 2005). In *Martin v. Richey*, 711 N.E.2d 1273 (Ind. 1999), the court held that the "statute of limitations may not constitutionally be applied to preclude the filing of a claim before a plaintiff either knows of the malpractice and resulting injury or discovers facts that, in the exercise of reasonable diligence, should lead to the discovery of the malpractice and the resulting injury." *Booth*, 839 N.E.2d at 1171.

> Under an occurrence-based statute, … the critical issue is what reasonable diligence requires, not when the claim accrues or is discovered. *Because the Medical Malpractice Act provides an occurrence-based limitations period, reasonable diligence requires more than inaction by a patient who, before the statute has expired, does or should know of both the injury or disease and the treatment that either caused or failed to identify or improve it, even if there is no reason to suspect malpractice. As a matter of law, the statute requires such a plaintiff to inquire into the possibility of a claim within the*

remaining limitations period, and to institute a claim within that period or forego it.

*Herron v. Anigbo*, 897 N.E.2d 444, 449 (Ind. 2008) (emphasis added). "A plaintiff does not need to be told malpractice occurred to trigger the statute of limitations." *Brinkman*, 879 N.E.2d at 555.

[42] The "critical date" on which a patient either knows of malpractice and the resulting injury or learns of facts that, in the exercise of reasonable diligence, should lead to the discovery thereof is known as the "trigger date." *Herron*, 897 N.E.2d at 449. "The length of time within which a claim must be filed after a trigger date in an occurrence-based statute also varies with the circumstances." *Id*. "A plaintiff whose trigger date is after the original limitations period has expired may institute a claim for relief within two years of the trigger date." *Id*. "But if the trigger date is within two years after the date of the alleged malpractice, the plaintiff must file before the statute of limitations has run if possible in the exercise of due diligence." *Id*. "If the trigger date is within the two-year period but in the exercise of due diligence a claim cannot be filed within the limitations period, the plaintiff must initiate the action within a reasonable time after the trigger date." *Id*.

[43] Here, the Orr Defendants assert that Poteet was aware of her cardiac disease and AP's treatment. They observe that Orr alleged in her amended proposed complaint that Poteet "suffered severe and permanent physical injuries and disabilities, endured great pain and suffering, mental distress and anguish and trauma" as a result of the Orr Defendants' alleged malpractice. Sitko/Orr

Appellants' App. Vol. 4 at 33. They also cite to Poteet's medical records, which contained all the information that Dr. Nasir needed to determine that the CRT-D was unnecessary, and documented her numerous health problems and hospital visits that occurred both before and after the CRT-D implantation. AH sums up their argument as follows: "Poteet knew she had a heart condition. She knew she had received a [CRT-D] for that condition. And she knew her condition failed to improve. These were all facts that, in the exercise of reasonable diligence, should have led to the discovery of the malpractice and the resulting injury." Sitko/Orr AH Appellant's Reply Br. at 11 (citations, quotation marks, and alterations omitted).

[44] We agree. Even if Poteet and Orr had no reason to suspect malpractice, reasonable diligence required them to inquire into the possibility of a claim years before the proposed malpractice complaint was filed in 2014; we need not pinpoint the trigger date, but it was certainly no later than the date of her death in 2007. Consequently, we reverse the denial of the Orr Defendants' summary judgment motion on Poteet's medical malpractice claims.

[45] In sum, we rule in favor of the defendants in all respects. Accordingly, we affirm in part and reverse in part.

[46] Affirmed in part and reversed in part.

Vaidik, C.J., and Kirsch, J., concur.