**FILED**

Oct 16 2023, 8:45 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Kevin E Steele
Burke Costanza & Carberry, LLP
Valparaiso, Indiana

Ryan A. Hiss
Marissa Downs
Laurie & Brennan, LLP
Chicago, Illinois

ATTORNEYS FOR APPELLEES

Gregory S. Gistenson
Eric D. Hewlett
Barnes & Thornburg, LLP
Chicago, Illinois

Michael V. Knight
Barnes & Thornburg, LLP
South Bend, Indiana

Larry G. Evans
Andrew T. Shupp
Hoeppner Wagner & Evans, LLP
Valparaiso, Indiana

Tina M. Bird
Thompson Coburn, LLP
Chicago, Illinois

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Luse Thermal Technologies, LLC, <br><br> *Appellant-Plaintiff,* <br><br> v. <br><br> Graycor Industrial Constructors, Inc. and BP Products North America, Inc., <br><br> *Appellees-Defendants.* | October 16, 2023 <br><br> Court of Appeals Case No. 23A-PL-633 <br><br> Appeal from the Lake Superior Court <br><br> The Honorable John M. Sedia, Judge <br><br> Trial Court Cause No. 45D01-2012-PL-849 |

**Opinion by Judge Riley.**
Judges Crone and Mathias concur.

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Plaintiff, Luse Thermal Technologies, Inc. (Luse), appeals the trial court's grant of partial summary judgment in favor of Appellee-Defendant, Graycor Industrial Constructors, Inc. (Graycor), on Luse's request for damages and unjust enrichment claim, and the trial court's grant of summary judgment in favor of Appellee-Defendant, BP Products North America, Inc. (BP), on Luse's claims based on the Personal Liability Notice Statute and unjust enrichment. In addition, Luse appeals the trial court's grant of BP's motion to strike certain evidentiary materials. Lastly, Luse appeals the trial court's denial of its motion for partial summary judgment with respect to Graycor's counterclaim relating to the recovery of certain contractual costs.

We affirm.

# ISSUES

Luse presents this court with several issues on appeal, which we consolidate and restate as the following seven issues:

(1) Whether the trial court abused its discretion by striking several of Luse's designated evidentiary materials;

(2) Whether the trial court erred in concluding, as a matter of law, that Luse's damages constituted damages for delay, as defined under Article 8.8. of the subcontract between Luse and Graycor, and are not recoverable under the provisions of the subcontract;

(3) Whether the trial court erred in concluding, as a matter of law, that Luse cannot assert a claim against Graycor based on unjust enrichment;

(4) Whether the trial court erred in concluding, as a matter of law, that Luse failed to comply with the Personal Liability Notice (PLN) Statute, Indiana Code section 32-28-3-9(b);

(5) Whether the trial court erred in concluding, as a matter of law, that Luse's claim based on unjust enrichment against BP was precluded;

(6) Whether the trial court erred by denying Luse's motion for partial summary judgment on Graycor's claim for reimbursement of additional costs because a genuine issue of material fact was created with respect to Graycor's contractual entitlement to these costs; and

(7) Whether Graycor is entitled to an award of appellate attorney fees.

## FACTS AND PROCEDURAL HISTORY

[4] This dispute centers around the construction of a Naptha Hydrotreater system (NHT) at BP's plant in Whiting, Indiana (Project). The NHT is a processing unit that removes sulfur from gasoline to reduce environmental impact. The construction project spanned several years, involved multiple subcontractors, and cost BP $385 million to complete. On November 16, 2017, BP issued a Request for Proposal (RFP), seeking a general contractor to guide the Project.

On May 17, 2018, BP entered into a Master Services Agreement with Graycor for the construction of the NHT. That same day, Graycor entered into a subcontract with Luse for the insulation and lagging work of the Project (Subcontract).

[5] The Subcontract specified that Luse would be paid $6,497,987 for its work on the Project and detailed in Article 8.8 that:

> 8.8 Delay Claims. The Subcontractor understands and agrees that the potential for its Work being delayed by the conduct of others is inherent in any construction project, including the Project. Accordingly, and other than to the extent the Contractor receives compensation from the Owner or any other entity responsible for such delay, the Contractor shall not be liable to the Subcontractor for any damages whatsoever that may be suffered by the Subcontractor, or for which the Subcontractor may become liable, on account of any acts or omissions on the part of (a) the Contractor or those for whom it is responsible, (b) the Owner, (c) the Design Professional, or (d) any other entity that may arise from or are in any way related to the Project or the Work. The Subcontractor further agrees: (i) any such delay, other than to the extent compensation is otherwise provided in this Subcontract, shall be fully compensated for by an extension of the time to complete performance of the Work and (ii) it shall make no claim due to delay in the performance of Work against those who might have a claim against the Contractor for such damages.

(Appellant's App. Vol. III, pp. 28-29). The Subcontract was not accompanied by a project schedule but, in line with what had been discussed during a prior meeting, Luse's work would commence on May 21, 2018, and reach substantial completion by August 22, 2019. The insulation scope of the Project was

divided into two different phases. First, Luse would mobilize immediately to insulate several large pieces of equipment which were to be delivered by barge to a staging area at the BP facility. Luse would then return in the spring of 2019 for a second phase, which entailed the insulation of the pipe portion of the Project. Insulation of the pipe portion would be one of the last activities to be completed on the NHT Project because Luse could not insulate the pipe until the other crafts had completed their part of the work.

[6] The Project experienced a number of delays which resulted in project deadlines being moved back. On February 6, 2019, Graycor and BP entered into what would be the first of three settlement agreements to resolve open change orders and claims that Graycor had submitted to BP. This First Settlement Agreement settled "all delay controversies that have arisen between May 1, 2018, and October 31, 2018" for a settlement payment of $2.7 million to be paid to Graycor by BP. (Appellant's App. Vol. VIII, p. 50). By May 2019, Luse became concerned with the small sections of pipe which had been released for insulation activities and Luse's resulting inability to progress its work toward its contractual completion deadline. As of August 22, 2019—Luse's anticipated completion date—Graycor had only released a small fraction of the entire pipe portion of the Project for Luse to insulate.

[7] By the fall of 2019, the NHT Project was significantly behind schedule. Graycor and BP reached an amicable resolution with respect to the slow progress of the work, culminating, on November 6, 2019, in the second settlement agreement (Second Settlement Agreement). The Second Settlement

Agreement increased Graycor's baseline contract price to $147 million, which represented an increase of approximately $27 million, and further contained an explicit commitment from Graycor that liquidated damages could be assessed against it at the rate of $250,000 per week up to a cap of $1 million in the event that Graycor would not finalize the work by the new deadline of January 31, 2020.

[8] In a meeting on December 12, 2019, Graycor requested Luse to increase manpower in order to adhere to the new completion date of January 31, 2020, and asked Luse to provide a cost proposal for the increased costs to complete the work under the changed circumstances. As directed by Graycor, Luse submitted a revised proposal with a cost increase of $1,136,211, excluding overtime costs, and a new schedule specifying pipe releases in order for Luse to timely complete the insulation. During the following weeks, Luse responded to Graycor's requests for further substantiation of its costs and issued several revised versions of its cost proposal. Graycor never agreed to any of Luse's cost proposals which Luse submitted for accelerating its work to meet Graycor's directives. On February 17, 2020, representatives from Luse and Graycor met again to discuss the costs Luse had incurred and would continue to incur until the completion of its work pursuant to Graycor's compressed schedule. Luse's February 17, 2020 claim asserted the actual hours lost as a result of Graycor's insistence to work at an accelerated pace and demonstrated $1,625,557 in additional out-of-pocket costs Luse had paid its union workers as a result of schedule changes. The original work plan had envisioned Luse completing the

pipe portion of the Project across a four-month period in the spring and summer of 2019. Graycor's directive in December 2019 for the pipe insulation to be finished by the end of January 2020 meant that Luse had to complete the majority of its work in less than two months during winter conditions on Lake Michigan's shoreline. Eventually, the NHT became operational in late July 2020.

[9] In May 2020, BP and Graycor commenced negotiations to close-out the NHT Project. In order to protect itself from subcontractor liens and PLN claims, BP inquired with Luse as to the amount it was owed by Graycor. On June 1, 2020, Luse's general manager, Gordon Vierck (Vierck), emailed the requested information to John Phillips (Phillips), BP's project manager. In his email Vierck identified different categories of amounts due to Luse from Graycor on the Project, which collectively totaled $3,710,651.76. The following day—June 2, 2020—BP and Graycor entered into the third settlement agreement (Third Settlement Agreement), pursuant to which BP agreed to pay Graycor a further $2 million for additional construction costs. The Third Settlement Agreement reaffirmed Graycor's lien-related covenants and required Graycor to secure a $25 million bond that would be triggered if Graycor failed to bond over any lien filed against BP's property.

[10] On November 4, 2020, Luse recorded a mechanic's lien against the property on which BP's plant is situated in the amount of $3,667,275.56. In its "Notice of Intention to Hold Mechanic's Lien and to Impose Personal Liability" Luse stated its intent that

in accordance with Indiana Code § 32-28-3-9 [] [Luse] intends to hold you personally liable for the payment of this claim to the extent of any monies which may now be due or which may hereafter become due from you to or for Graycor, either directly or indirectly or through other contractors or parties.

(Appellant's App. Vol. VI, p. 15).

[11] On December 10, 2020, Luse filed its Complaint against Graycor and BP, seeking to foreclose its lien and recover the amount still owed for services rendered at the BP plant. Luse's Complaint asserted claims for breach of contract and unjust enrichment against Graycor and claims for PLN liability and unjust enrichment against BP. On February 4, 2021, Graycor filed its responsive pleading which included a counterclaim based on breach of contract against Luse and which asserted a claim for $1,681,829 in direct expenses it had incurred as a result of delay and perceived faulty work caused by Luse. On March 8, 2021, BP filed its answer to the Complaint.

[12] On October 21, 2022, the trial court established a revised briefing schedule for motions for summary judgment as well as the responses and replies relative thereto. On October 28, 2022, Luse, BP, and Graycor each filed their motions for summary judgment together with designations of evidentiary materials. Graycor's motion sought partial summary judgment on the breach of contract and unjust enrichment claims in Luse's Complaint; BP sought summary judgment on the PLN liability and unjust enrichment claim; and Luse sought partial summary judgment on Graycor's counterclaim. On December 9, 2022, Luse and Graycor filed responses to the motions for summary judgment,

together with supplemental designations of evidence. On January 20, 2023, all three parties filed replies in support of their motions for summary judgment. Both BP and Luse filed supplemental designations with their reply briefs. BP additionally filed a motion to strike portions of the affidavit and legal argument Luse had designated with its response to BP's motion for summary judgment. On January 26, 2023, Graycor moved to strike—in which BP joined five days later—the supplemental designation of evidence that Luse had concurrently filed with its reply brief. On February 6 and 10 respectively, Luse filed briefs in opposition to BP's and Graycor's motions to strike.

[13] On February 23, 2023, the trial court conducted a hearing on all three motions for summary judgment and the two motions to strike. On February 27, 2023, the trial court issued its judgment, granting summary judgment to BP after granting BP's motion to strike Luse's affidavit evidence, granting Graycor's motion for partial summary judgment, denying, in part, Luse's motion for partial summary judgment on Graycor's counterclaim, and granting BP's and Graycor's motion to strike Luse's supplemental designation of evidence.

[14] Luse now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

I. *Standard of Review*

[15] Luse challenges the trial court's grant of summary judgment to BP and Graycor. "The purpose of summary judgment is to terminate litigation about which there can be no factual dispute and which can be determined as a matter

of law." *Lamb v. Mid Ind. Serv. Co.*, 19 N.E.3d 792, 793 (Ind. Ct. App. 2014). "The party moving for summary judgment has the burden of making a *prima facie* showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Mint Mgmt., LLC v. City of Richmond*, 69 N.E.3d 561, 564 (Ind. Ct. App. 2017); Ind. Trial Rule 56(C). Summary judgment is a "high bar" for the moving party to clear in Indiana. *Hughley v. State*, 15 N.E.3d 1000, 1004 (Ind. 2014). If "the moving party satisfies this burden through evidence designated to the trial court, the non-moving party may not rest on its pleadings, but must designate specific facts demonstrating the existence of a genuine issue for trial." *Biedron v. Anonymous Physician 1*, 106 N.E.3d 1079, 1089 (Ind. Ct. App. 2018) (quoting *Broadbent v. Fifth Third Bank*, 59 N.E.3d 305, 311 (Ind. Ct. App. 2016), *trans. denied*), *trans. denied*. "A fact is material if its resolution would affect the outcome of the case, and an issue is genuine if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009) (citation and quotation marks omitted).

[16] We review a court's ruling on a summary judgment motion *de novo*, applying the same standard as the trial court. *Hughley*, 15 N.E.3d at 1003. "In conducting our review, we consider only those matters that were designated to the trial court during the summary judgment stage." *Lowrey v. SCI Funeral Servs., Inc.*, 163 N.E.3d 857, 860 (Ind. Ct. App. 2021), *trans. denied*. "In determining whether issues of material fact exist, we neither reweigh evidence

nor judge witness credibility [but] accept as true those facts established by the designated evidence favoring the non-moving party." *Id*. (citations omitted). "Any doubts as to any facts or inferences to be drawn from those facts must be resolved in favor of the nonmoving party." *Denson v. Est. of Dillard*, 116 N.E.3d 535, 539 (Ind. Ct. App. 2018). However, "[m]ere speculation is insufficient to create a genuine issue of material fact to defeat summary judgment." *Biedron*, 106 N.E.3d at 1089. In the summary judgment context, we are not bound by the trial court's findings of fact and conclusions thereon, but they aid our review by providing the reasons for the trial court's decision. *Howard Cnty. Sheriff's Dep't & Howard Cnty. 911 Commc'ns v. Duke*, 172 N.E.3d 1265, 1270 (Ind. Ct. App. 2021), *trans. denied*. The party that lost in the trial court bears the burden of persuading us that the trial court erred. *Biedron*, 106 N.E.3d at 1089.

II. *Motion to Strike*

[17] Because a summary judgment rests upon the specific facts included in the designated evidence, we must, as an initial matter, determine whether the trial court abused its discretion by striking certain designated materials submitted by Luse. "A trial court has broad discretion in granting or denying a motion to strike." *Auto-Owners Ins. Co. v. Bill Gaddis Chrysler Dodge, Inc.*, 973 N.E.2d 1179, 1182 (Ind. Ct. App. 2012), *trans. denied*. An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Webb v. City of Carmel,* 101 N.E.3d 850, 857 (Ind. Ct. App. 2018). This discretion extends to rulings on motions to strike where a

party argues that a filing fails to comply with the summary judgment rules. *Price v. Freeland*, 832 N.E.2d 1036, 1039 (Ind. Ct. App. 2005).

[18]    The trial court's grant of the motion to strike Luse's designated evidence rested upon two allegations.  First, Graycor, joined by BP, sought to strike Luse's supplemental designation filed with its reply brief because Luse filed its designation without seeking prior leave from the trial court.  Secondly, BP sought to strike certain allegations included in an affidavit submitted by Luse.  Luse now appeals both claims.  We will analyze each contention in turn.

A. *Supplemental Designation*

[19]    On October 21, 2022, the trial court notified the parties of its revised briefing schedule for any dispositive motions, in which it ordered the parties to submit motions on or before October 28, 2022, responses thereto on or before December 9, 2022; and replies on or before January 20, 2023.  In accordance with this briefing schedule, all three parties filed their motions for summary judgment and designated evidence on October 28, 2022.  Luse and Graycor filed a response, together with designated evidence by December 9, 2022, and thereafter, all three parties filed a reply by January 20, 2023, with BP and Luse filing supplemental evidentiary designations with their reply motion.  After moved by BP and Graycor, the trial court struck Luse's supplemental designation, containing an additional eighteen exhibits as well as a new affidavit which Luse had filed with its reply motion, because "[w]ithout a [m]otion by Luse with notice and an opportunity to respond afforded to

Graycor, the [c]ourt is not disposed to consider the supplemental designation." (Appellant's App. Vol. II, p. 26). Although Luse had timely filed its reply, Luse contends that the trial court abused its discretion by striking the supplemental evidence Luse designated with its reply brief on the ground that Luse had failed to seek prior leave of the court for its filing of supplemental evidentiary materials.

[20] In *Spudich v. Northern Indiana Public Service Co.*, 745 N.E.2d 281 (Ind. Ct. App. 2001), *trans. denied*, we addressed a similar issue. There, NIPSCO filed a motion for summary judgment, Spudich filed a response, and NIPSCO then filed a reply brief with the trial court's permission. *Id*. at 285. Spudich filed a motion to strike the reply, which the trial court denied. *Id*. On appeal, Spudich argued that Trial Rule 56 did not "specifically provide for the filing of reply briefs on summary judgment[.]" *Id*. at 286. We noted that Trial Rule 56 "neither expressly permits nor precludes such a reply brief." *Id*. at 287. The Rule does, however, "provide for affidavits submitted in support or in opposition to summary judgment to be supplemented or opposed by depositions, answers to interrogatories, and further affidavits." *Id*. Thus, we found that the submission of additional evidence after the initial filings is contemplated by the Rule. We noted that the "practice of filing a reply brief on summary judgment was not unique" and we held that NIPSCO was allowed to include additional designations of evidence with the reply brief and arguments not made in its original motion. *Id*. at 288-89.

Relying on *Spudich*, we reached the same result in *Auto-Owners Ins. Co. v. Benko,* 964 N.E.2d 886, 889-90 (Ind. Ct. App. 2012), *trans. denied*. There, the insured filed a motion for summary judgment, the insurer filed a response, and the insured then supplemented her designation of evidence without obtaining permission from the trial court. *Id*. The insured filed a motion to strike the supplemental designation, which the trial court denied. *Id*. On appeal, we held, "[i]n the absence of any language in Trial Rule 56 explicitly prohibiting reply briefs and such designations and in light of these facts and circumstances, we cannot say the trial court erred in denying [the insured's] motion to strike." *Id*. at 890.

And again, similarly, in *Jacks by Jacks v. Tipton School Corporation*, 94 N.E.3d 712, 715 (Ind. Ct. App. 2018), the School filed a motion for summary judgment and designation of evidence to which the Jacks Family responded. The School then filed a reply brief and supplemental designation of evidence. *Id.* The Jacks Family moved to strike the School's reply and supplemental evidence because the School had not pursued the trial court's permission prior to filing the reply and supplemental evidence. *Id.* The trial court denied the motion. *Id*. "Based on the language of Trial Rule 56, *Spudich*, and *Benko*," the appellate court found no error by the trial court in allowing the School's reply and supplemental designation. *Id.* at 716. We concluded that "Trial Rule 56 does not prohibit reply briefs and specifically allows the designated evidence to be supplemented." *See also Reed v. City of Evansville*, 956 N.E.2d 684, 690 (Ind. Ct. App. 2011) (trial court may permit affidavits accompanying motion for

summary judgment to be supplemented by additional affidavits accompanying the movant's reply).

[23] Accordingly, based on the interpretation of Trial Rule 56 and the relevant jurisprudence, Luse was allowed to timely file its reply brief and supplemental evidence without being required to seek prior leave from the trial court. However, Trial Rule 56(E) clearly invokes the trial court's discretion in admitting the supplemental evidence after the documents have been filed as the Rule expressly notes that "[t]he court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits." During the hearing on the parties' motions, the trial court, after receiving arguments on the motion to strike, expressed concern that Luse filed new designated evidence barely one month prior to the hearing which left the trial court with two options: either admit Luse's supplemental designations and continue the hearing to allow Graycor to supplement its evidence, or deny Luse's additional evidence. Accordingly, in light of these concerns, we cannot say that the trial court's denial of Luse's supplemental evidence was against "the logic and effect of the facts and circumstances before the court." *Webb*, 101 N.E.3d at 857.

B. *Statements made in Affidavit*

[24] When BP filed its reply in further support of its summary judgment motion, it concurrently filed a motion seeking to strike certain statements made by Steve Luse, the president of Luse during the time Luse performed work on the NHT

Project, in his affidavit. Specifically, BP sought to strike the following averments based on relevancy concerns:

> During [the May 26, 2020] call, Mr. Phillips informed me that BP was having some problems with Graycor on the Project and expressed some concerns about outstanding payments that Graycor needed to make to a few of its subcontractors, including Luse. Mr. Phillips stated he wanted to get his arms around this payment issue.
>
> Mr. Phillips expressed that he knew Graycor owed money to Luse, and he wanted to understand what Luse was due and owed from Graycor for services performed on the Project.
>
> I took some comfort in this discussion as it demonstrated that Mr. Phillips and BP wanted to make sure Luse got paid for the services it provided on the Project and was taking steps to make sure we did get paid.
>
> As of June 1, 2020, Luse intended to seek its outstanding payment from Graycor, and if Graycor continued to refuse to pay, directly from BP. The conversation with John Phillips of BP led me to believe that it was possible that Luse may be paid directly by BP or at least make sure Luse got paid what we were owed and promised from Graycor.
>
> Mr. Phillips' conversation with me on May 26, 2020, was not typical in the construction industry. It is rare that an owner of a construction project directly reaches out to Luse to determine what Luse is due and owed from the general contractor on a given project. I can't recall that ever occurring before in my career. It was clear to me that BP wanted to obtain this payment information direct from Luse in order for BP to use that information for some specific purpose. Mr. Phillips only

revealed that he wanted this information to understand what Luse was owed because of the difficulties BP was experiencing with Graycor.

(Appellant's App. Vol. IX, pp. 244-46). On February 27, 2023, the trial court granted BP's motion on the ground that the court "agree[d] with BP that the materials sought to be stricken are not relevant to the Personal Liability Notice issues raised in BP's [m]otion for [s]ummary [j]udgment." (Appellant's App. Vol. II, p. 26).

[25] On appeal, Luse contends that the trial court abused its discretion in striking the statements because "[t]he aforementioned statements were grounded in Mr. Luse's personal observations from a conversation in which he was one of two participants." (Appellant's Br. p. 71). However, Luse's contention and supporting argument ignore the fact that the trial court struck the disputed averments based on relevancy considerations.

[26] Even if we evaluate the averments about Mr. Luse's understanding of BP's actions with respect to BP's PLN liability based on relevancy grounds, the affidavit must be stricken and the trial court's decision must be affirmed as the statute requires that all elements of a PLN claim must be asserted in writing. *See* Ind. Code § 32-28-3-9(b) ("[I]n order to acquire rights under this section, a [subcontractor] (a) must give to the property owner, [] written notice particularly setting forth the amount of the person's claim and services rendered for which [] (2) the person holds the property owner responsible.") Accordingly, Steve Luse's affirmations as to what he perceived BP's possible

intent to be when BP inquired into Graycor's perceived indebtedness to Luse is immaterial as to the question of whether Luse informed BP in writing that it intended to hold BP personally liable.

[27] As Luse fails to argue—let alone formulate a persuasive argument—that the averments made it more or less probable that all the elements of a PLN claim were present, we refuse to disturb the trial court's decision.

**Graycor's Motion for Partial Summary Judgment**

III. *Damages for Delay*

[28] A large portion of Luse's Complaint is devoted to its claim for damages. In its Complaint, Luse alleges: "Graycor materially and substantially changed Luse's scope of work under the Subcontract by rescheduling the work from the more productive summer and fall months to the challenging, less productive, and more costly winter months. This schedule change was unilaterally imposed by Graycor upon Luse and significantly increased the cost to perform the scope of work under the Subcontract." (Appellant's App. Vol. II, pp. 30-31). Luse continues to allege: "Graycor materially and substantially changed Luse's scope of work by unilaterally modifying when areas of the Project would be released to Luse to commence its services. This schedule and sequence alteration was unilaterally imposed by Graycor upon Luse and caused Luse to proceed with its work and labor allocation in a substantially different and much more costly manner than agreed under the terms and conditions of the Subcontract." (Appellant's App. Vol. II, p. 31). Luse breaks down its claim for

damages into five categories: (A) alleged contract balance; (B) alleged balance for commissioning work; (C) unpaid overtime; (D) unpaid out of scope services and (E) "additional costs incurred as a result of changed conditions, schedule overrun, delays in work releases, and other impacts described in the Complaint." (Appellant's App. Vol. IV, pp. 185-87). Although Luse's Claim Support Summary states that the damages it claims in section (E) are "TBD," designated evidence reflects that Luse valued this category at $1,625,557 on February 17, 2020. (Appellant's App. Vol. II, p. 31). When the values claimed in Luse's Claim Summary (A) through (D) are subtracted from the number claimed in Luse's Complaint and Mechanic's Lien Claim, the amount equates to $1,650,332.44. As such, over $1.6 million of Luse's claim is comprised of a claim for 'changed conditions, schedule overrun, delays in work releases, and other impacts described in the Complaint' and as defined in the Subcontract. Graycor, in its motion for partial summary judgment—which was granted by the trial court—contended that Luse was precluded from recovering these Section (E) damages under Article 8 of the Subcontract.

[29] Construction of written contracts is generally a question of law for which summary judgment is particularly appropriate. *Forty-One Assoc. v. Bluefield Associates L.P.*, 809 N.E.2d 422, 427 (Ind. Ct. App. 2004). When the terms of a contract are clear and unambiguous, those terms are conclusive, and the court will not construe the contract or look at extrinsic evidence, but rather will simply apply the contract provisions. *Forty-One Associates,* 809 N.E.2d at 427; *Stout v. Kokomo Manor Apartments*, 677 N.E.2d 1060, 1064 (Ind. Ct. App. 1997);

*Stelko Elec., Inc. v. Taylor Cmty. Sch. Bldg. Corp.*, 826 N.E.2d 152, 155-156 (Ind. Ct. App 2005). "When a court finds a contract to be clear in its terms and the intentions of the parties apparent, the court will require the parties to perform consistently with the bargain they made." *AM Gen. LLC v. Armour*, 46 N.E.3d 436, 442 (Ind. 2015).

[30] The Subcontract at the center of this dispute and which forms the basis of Luse's claim contained the following pertinent provisions:

> 8.1 Claim Conditions. The Subcontractor shall notify the Contractor in writing of every event, occurrence, condition, direction, instruction or decision that the Subcontractor has reason to believe gives rise or may give rise to the right under this Subcontract to either additional compensation for or an extension of time within which to do the Work (the "Claim Condition").

> 8.2 Notification. The Subcontractor's notice to the Contractor must be delivered to the Contractor within forty-eight (48) hours of the time that the Subcontractor either knew or should have known of the Claim Condition upon which the Subcontractor's request is or will be based. The notice shall include the Subcontractor's good faith assessment of the Claim Condition on the Work and the Subcontractor's best estimate, based upon the information available, as to the nature of the Claim Condition.

> 8.3 Records and Certification. With respect to each Claim Condition, the Subcontractor shall keep daily a separate record identifying the labor hours worked, machinery and equipment hours utilized, and the material expended or incorporated into the Work because of the Claim Condition. These records will be delivered to the Contractor on a daily basis. By delivering the Subcontractor's records to the Contractor, the Subcontractor

certifies to the Contractor that the records are true and correct and are not submitted for any false, fraudulent, or other improper purpose.

* * * *

8.7 Failure to Comply. The Subcontractor understands and agrees that its failure to comply with these requirements for presentation of a Claim Condition shall constitute a waiver, on all grounds, of any claim for compensation or an extension of time arising out of or related to it.

8.8 Delay Claims. The Subcontractor understands and agrees that the potential for its Work being delayed by the conduct of others is inherent in any construction project, including the Project. Accordingly, and other than to the extent the Contractor receives compensation from the Owner or any other entity responsible for such delay, the Contractor shall not be liable to the Subcontractor for any damages whatsoever that may be suffered by the Subcontractor, or for which the Subcontractor may become liable, on account of any acts or omissions on the part of (a) the Contractor or those for whom it is responsible, (b) the Owner, (c) the Design Professional, or (d) any other entity that may arise from or are in any way related to the Project or the Work. The Subcontractor further agrees: (i) any such delay, other than to the extent compensation is otherwise provided in this Subcontract, shall be fully compensated for by an extension of the time to complete performance of the Work and (ii) it shall make no claim due to delay in the performance of Work against those who might have a claim against the Contractor for such damages.

(Appellant's App. Vol. III, pp. 28-29).

[31] Although the contracted completion date of the Project was August 31, 2019, the designated evidence reflects that Graycor "moved the completion date back" due to Graycor encountering "a variety of issues with pipe deliveries and installation, plant constraints delaying heavy haul, delayed concrete placement causing delayed steel erection, and added fireproofing scope." (Appellant's App. Vol. VI, pp. 167, 171). Luse subsequently became concerned with "the slow releases of pipe" and, by August 22, 2019, only a small portion of Luse's work was ready. (Appellant's App. VII, p. 151). Accordingly, Luse's claim is based upon delays in the Project—either delays in the completion of work by other contractors which was necessary for Luse to perform its work, or delays in the release of the pipe to Luse so it could begin its contracted work.

[32] Luse now attempts to avoid the application of Article 8.8 of the Subcontract by characterizing its delay claim as an acceleration of its own work schedule based on Graycor's instruction to "increase manpower" or 'accelerate' its schedule in a meeting in December 2019. (Appellant's App. Vol. VII, p. 3). Luse maintains that during this meeting Graycor directed Luse to increase manpower to complete its work by the end of January 2020, thereby compressing the schedule and accelerating the pace at which Graycor was requesting Luse to complete its work. In other words, Luse advocates that because other aspects of the project had encountered delays, Luse was required to complete its work faster in order to comply with the new deadline. As such, Luse argues that "[t]he impacts that Luse has claimed on this Project are not damages for 'delay' at all but rather damages which were incurred due to a

Graycor-directed change to Luse's work and the adverse impacts incurred due first to Graycor's 'disruption' and then to Graycor's 'acceleration.'" (Appellant's Br. p. 33). Because Graycor moved Luse's portion of the Project work to the winter months, Luse maintains that the additional costs which it now claims derived from "productivity impacts resulting from a variety of causes but predominantly winter weather, absenteeism, low morale, and worker fatigue stemming from being directed to work at a break-neck pace from December 2019 until the finish." (*See* Appellant's App. Vol. IX, pp. 64-84).

[33] Both parties refer to *Stelko Elec. Inc. v. Taylor Cmty. Sch. Bldg. Corp.*, 826 N.E.2d 152 (Ind. Ct. App. 2005) in support of their respective arguments. In that case, Stelko attempted to avoid the no damages for delay provision contained in its contract by making a similar claim as Luse, *i.e.,* that the claim was for the acceleration of the work schedule. *Id*. at 157-58. However, we find *Stelko* to be inapplicable to the case at hand because the *Stelko* court did not resolve the distinction between contractual delay versus acceleration as it concluded that "Stelko [] provided no evidence that it was obligated to complete the contract four months early." *Id*. at 159.

[34] While we can support a distinction between delay and acceleration under certain circumstances, it would seem that in many cases, if not in most cases, the alleged 'acceleration' is in fact the result of 'delay,' or, to put it differently, because of delay caused by or attributable to the owner or a contractor, a contractor or subcontractor is of necessity forced to compress or speed up the work necessary to be completed before the contract completion date. Here, the

time compression that caused the acceleration of Luse's work was itself caused by delay in the work of predecessor trades. Because the early stages of the Project were not completed as expeditiously as planned by other contractors, Luse's work could not commence until later than expected. Thus, Luse was delayed and thereby forced to accelerate the pace at which it performed its work in order to meet the Project's deadline. Because Luse's 'acceleration' costs were the result of delay, and delay damages are not recoverable under the unambiguous terms of Article 8.8 of the Subcontract, Luse's claim must fail. Pursuant to the provision, the only recovery Luse is entitled to in case of delay is an extension of time; however, no party designated evidence that Luse requested Graycor for a time extension at any point during the course of the Project.[1]

[35] Invoking the exception language in Article 8.8 that delay damages may be compensable "to the extent the Contractor receives compensation from the Owner or any other entity responsible for such delay," Luse now—

---

[1] Moreover, the designated evidence also establishes that Luse failed to comply with the Subcontract's notice provisions. Article 8.2 requires Luse to provide notice to Graycor within forty-eight hours of the time that Luse either knew or should have known of a Claim Condition. A Claim Condition is defined in Article 8.1 as including an event that gives rise or may give rise to the right under the Subcontract to either additional compensation or an extension of time within which to do the Work. Luse concedes that the February 17, 2020 notice is the first notification of Luse to Graycor that it was claiming $1,625,557 in delay damages going back to the inception of the Project. A notice of claim in February 2020 for damages dating back to September 2019 violates Luse's contractual obligation to provide notice within forty-eight hours of the event occurring. Even if the February 17, 2020 notice that was eventually submitted to Graycor was timely, it fails to comply with the provisions of Article 8.3 requiring the notice to be accompanied by the labor hours worked, machinery and equipment hours utilized, and the material expended or incorporated into the work because of the Claim Condition.

alternatively—contends that the Second Settlement Agreement indicates that Graycor received a settlement payment for increased costs on the Project as a result of delay, disruption, and labor productivity impacts. (Appellant's App. Vol. III, p. 29). Specifically, Luse points to the Second Settlement Agreement, in which Graycor, in exchange for the settlement amount, agreed to waive and release "any and all future claims or potential claims for additional payment and/or extension of the schedule based on delay, disruption, interference, acceleration, cardinal change, extra work or increased cost based on or arising out of anything that occurred (or failed to occur) before the Effective Date."[2] (Appellant's App. Vol. VIII, p. 54). However, a plain reading of the Second Settlement Agreement fails to establish that BP agreed to reimburse Graycor for delay damages as the Second Settlement Agreement clearly is written in the disjunctive "and/or." Designated evidence by way of representative testimony of BP and Graycor established that Graycor never received compensation from BP for incurred damages due to delays. Specifically, when questioned about payment for delays relative to the Second Settlement Agreement, BP's corporate representative testified, "we were not paying for any--for the contractor's inefficiencies. That was their problem. They dealt with it. We weren't paying for inefficiencies, so it was zero." (Appellant's App. Vol. IV, p. 212).

---

[2] Similar language was included with respect to subcontractor claims.

[36] Turning to Article 5 of the Subcontract, Luse also maintains that, disregarding the specific character of the damages sought, the contractual language embedded in Article 5 "reserves the right to the contractor to make changes to the work" and, in turn, entitles a subcontractor to seek an adjustment in the contract price when the contractor changes the scope of the work or the conditions under which the work is to be performed. (Appellant's App. Vol. III, p. 25). Subsection 5.3 details that "[a]fter the Contractor and the Subcontractor have agreed to any adjustment to the Subcontract Price and the Subcontract Time, the Contractor will prepare a written Change Order to this Subcontract for signature." (Appellant's App. Vol. III, p. 26). Luse relies on designated evidence to show that, on December 12, 2019, after Graycor had entered into the Second Settlement Agreement and had committed to a new completion date of January 31, 2020, Graycor directed Luse to increase its manpower and work overtime to complete its work within the agreed upon Project completion date. Luse characterizes this as a 'change' to Luse's work because it forced Luse to adopt a more strenuous work schedule and to employ more labor than what was originally contemplated. Luse argues that because Graycor recognized this cost impact, Graycor requested that Luse supply a cost proposal for performing its work on an accelerated basis. Luse provided the cost proposal to Graycor on December 16, 2019.

[37] Regardless as to whether Graycor's request amounts to a change, as contemplated within Article 5, Subsection 5.1 clearly provides that "[t]he Subcontractor will not proceed with furnishing or providing any Changes

without receiving, in advance, the Contractor's written authorization to perform the Changes." (Appellant's App. Vol. III, p. 25). Luse conceded that no such signed change order has been designated before this court.

[38] Mindful of the clear and unambiguous terms of Article 8.8 of the Subcontract which prohibits damages for delay, Luse's claim against Graycor, in the absence of any designated evidence indicating that BP reimbursed Graycor for delay damages, fails. *See First Fed. Sav. Bank of Ind. v. Key Mkts., Inc.,* 559 N.E.2d 600, 604 (Ind.1990*)* ("When a court finds a contract to be clear in its terms and the intention of the parties apparent, the court will require the parties to perform consistently with the bargain they made."). As no designated evidence reflects a genuine issue of material fact, we affirm the trial court's summary judgment in favor of Graycor.

IV. *Unjust Enrichment with respect to Graycor*

[39] As an alternative argument to its breach of contract claim, Luse asserted an unjust enrichment claim against Graycor. Although the trial court in its findings and conclusions thereon did not explore Luse's unjust enrichment claim, the court's summary judgment in favor of Graycor implicitly denied Luse's claim based on the doctrine of unjust enrichment.

[40] A claim for unjust enrichment is a legal fiction courts conceived to permit recovery where the circumstances are such that "under the law of natural and immutable justice there should be a recovery[.]" *Zoeller v. E. Chicago Second Century, Inc.*, 904 N.E.2d 213, 220 (Ind. 2009). Courts thereby impose

obligations "without regard to the assent of the parties bound, to permit a contractual remedy where no contract exists in fact but where justice nevertheless warrants a recovery under the circumstances as though there had been a promise." *City of Indianapolis v. Twin Lakes Enters., Inc.*, 568 N.E.2d 1073, 1078 (Ind. Ct. App. 1991), *trans. denied*. "To prevail on a claim of unjust enrichment, a claimant must establish that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust." *Second Century*, 904 N.E.2d at 220. Essentially, unjust enrichment is the remedy for breach of a constructive contract, implied in law. *See id.*; *Twin Lakes Enters.*, 568 N.E.2d at 1078.

[41] However, "[w]hen the rights of parties are controlled by an express contract, recovery cannot be based on a theory implied in law." *Keystone Carbon Co. v. Black*, 599 N.E.2d 213, 216 (Ind. Ct. App. 1992), *trans. denied*. Indeed, "[a]s a general rule, there can be no constructive contract where there is an express contract between the parties in reference to the same subject matter." *Twin Lakes Enters.*, 568 N.E.2d at 1079; *accord Keystone Carbon*, 599 N.E.2d at 216. On the contrary, the existence of an express contract will not prevent a party from presenting to a jury a breach of contract theory and a *quantum meruit* theory if "the express contract arguably cover[s] a different subject matter than that upon which [the plaintiff] sought a remedy in quasi-contract." *Id*.

[42] Claiming that its breach of contract claim and unjust enrichment theory are not mutually exclusive, Luse contends that performance on the Subcontract was

made impossible "due to the fact that the pipe that Luse was to insulate was not made available by Graycor before that date[,] [] and Luse was ultimately requested to perform its work under completely different conditions than originally planned." (Appellant's Br. p. 58). Luse's contention is almost identical to the one raised to support its breach of contract claim. As we determined that these circumstances were covered by Article 8.8 of the Subcontract, the existence of the express contract covering the subject matter complained of precludes Luse's unjust enrichment claim. *See id.*

[43] Luse now attempts to avoid the application of the express contract to bar the unjust enrichment doctrine by claiming that the Subcontract had been abandoned by Graycor's failure to update Luse's contract price and completion date in any change order or contractual amendment. In support of its argument that an abandonment of the Subcontract by Graycor occurred, which spurred the application of the unjust enrichment doctrine to take effect, Luse relies on *Rudd v. Anderson*, 285 N.E.2d 836, 840 (Ind. Ct. App. 1972), which stands for the proposition that "where there have been so many substantial changes to the [] contract that it can no longer be used to determine the value of the work done, then reasonable value may be used." However, here, there were no substantial changes to the work. Luse was always contractually obligated to perform the insulation and lagging work of the project within a contractual timeframe. Due to delays on the part of Graycor and other crafts, the timeline for Luse's work was pushed back, but the scope of the work remained the same. Referencing its original proposal to Graycor, Luse is now contending that the

Subcontract was abandoned because its work was to be performed under the completely different conditions of winter months at Lake Michigan instead of the contractually envisioned summer months. This argument has no merit given the fact that Article 1.2 of the Subcontract, which specifies the documents constituting the basis of the agreement, does not include Luse's proposal. The Article further details that "[a]ny terms and conditions proposed by the Subcontractor that are different from or in addition to the Subcontract Documents are not accepted by the Contractor and are not part of this Subcontract." (Appellant's App. Vol. III, p. 21). As it is uncontroverted that the pipe release schedule which placed Luse's performance of the work in the summer months and which was included in Luse's proposal, was never incorporated into the Subcontract, Graycor never contractually agreed to Luse's schedule and therefore, Luse's claim that the Subcontract was abandoned when the pipeline was not released in accordance with Luse's schedule cannot stand.

## BP's Motion for Summary Judgment

V. *Personal Liability Notice*

[44] In its Complaint, Luse brought a claim against BP under the PLN statute set forth in Indiana Code section 32-28-3-9, which provides a remedy for a subcontractor who delivers goods and services on a construction project to establish liability on the part of the owner of the project for the amounts unpaid by the general contractor. After BP sought summary judgment on this claim, the trial court granted the motion, concluding that the designated evidence

established, as a matter of law, that Luse had failed to comply with the requirements of the PLN statute. Appealing the trial court's summary judgment, Luse contends that its email of June 1, 2020 to BP complied with the provisions of the PLN statute.

[45] In order to acquire rights under the PLN statute, a subcontractor

> must give to the property owner, or if the property owner is absent, to the property owner's agent, written notice particularly setting forth the amount of the person's claim and services rendered for which:
>
> (1) the person's employer or lessee is indebted to the person; and
>
> (2) the person holds the property owner responsible.

I.C. § 32-28-3-9. This personal liability provision is designed to protect a subcontractor "from the consequences of the [general] contractor's absconding or going broke or otherwise defaulting" by providing to the subcontractor a means of shifting from himself to the owner the burden of the general contractor's financial difficulties. *McCorry v. G. Cowser Constr., Inc.*, 636 N.E.2d 1273, 1278 (Ind. Ct. App. 1994), *adopted on transfer* 644 N.E.2d 550 (Ind. 1994). Thus, the purpose of Indiana Code section 32-8-3-9 is to "prevent the inequity of an owner enjoying the fruits of a subcontractor's labor and materials without paying for them." *Id.* at 1279.

[46] The designated evidence relative to Luse's PLN claim establishes that, in May 2020, in an effort to close-out the project, Phillips, BP's project manager, reached out to Luse to determine the outstanding amount owed to Luse by

Graycor. In response to BP's request, on June 1, 2020, Vierck emailed Phillips Luse's unpaid contract balance in the amount of $3,710,651. Besides the amounts due, the email stated, in its totality, "[Phillips], [p]er your request, please see attached for all info regarding current contract status with Graycor for our performance on the NHT project. Please let me know if you have any questions." (Appellant's App. Vol. X, p. 27). Luse now contends that this email is sufficient to trigger the requirements of the PLN statute. We are not persuaded.

[47] In *SLR Plumbing & Sewer, Inc. v. Turk*, 757 N.E.2d 193 (Ind. Ct. App. 2001), this court concluded that a subcontractor's letter to the homeowner was insufficient to invoke the provisions of the PLN statute. We found that the letter, on its face, gave the homeowner notice that the subcontractor had recently furnished labor and materials on the homeowner's project; however, by failing to make any reference to the PLN statute, the letter failed to notify the homeowner that the subcontractor intended to hold them personally liable for compensation under Indiana Code section 32-8-3-9, and that the subcontractor expected to be paid directly by homeowner for its plumbing services. *Id.* at 199. We explicitly referenced the trial court's observation that "[t]he only allusion to personal liability appears in the second paragraph of the letter in which [subcontractor] states it is due $12,760.30, that [general contractor] has not paid it and this amount[.] Nowhere in this letter does [subcontractor] tell [homeowners] that they are being held personally responsible to pay [subcontractor] for the plumbing work. . . . In addition this letter could also be interpreted as a means

to encourage [homeowners] to contact [general contractor] for the purpose of encouraging [general contractor] to pay [subcontractor]." *Id.*

[48] Accordingly, the PLN statute requires fair warning, in the manner described by the legislature, to a project owner that a subcontractor intends to impose personal liability. *See id.* at 198 ("[T]o invoke the protection of Indiana Code section 32-8-3-9, [s]ubcontractor bears the burden of proving that its letter sufficiently complied with the notification requirements of the statute."). Here, Luse's June 1, 2020 email constituted insufficient notice to BP of Luse's intent to hold BP personally liable for Graycor's debt. Nowhere in the email does Luse request BP to pay Graycor's debt; rather, the email is merely an informative reminder to BP of the amounts owed to Luse by Graycor. In his designated deposition, Vierck admitted that he did not ask "BP to provide payment," but that sending the email "was to get BP to get Graycor to pay Luse." (Appellant's App. Vol. V, pp. 50, 56). Vierck confirmed that the email was not "intend[ed] to convey that [Luse] w[as] invoking the code." (Appellant's App. Vol. V, p. 84). Where, as here, the designated evidence uncontrovertibly affirmed that there was no attempt to communicate an intent to impose personal liability, we can conclude that the June 1, 2020 email contains even less than the claimed PLN notice in *SLR Plumbing*, which we found to be insufficient under the statute.

[49] Luse's main contention on appeal is that compliance with the dictates of *SLR Plumbing* is too strict and that we instead should adhere to the substantial compliance test, as found in *Von Tobel Corp. v. Chi-Tec Const. & Remodeling*, 994

N.E.2d 1215 (Ind. Ct. App. 2013), and find that the June 1, 2020 email substantially complied with the requirements of the PLN statute to place BP on notice that it was being held personally liable for Graycor's debt to Luse. Although we rejected a strict compliance with the statutory requirements in favor of a substantial compliance test in *Von Tobel*, we also observe that *Von Tobel* interpreted the mechanic's lien statute and not the PLN statute. *Id*. at 1219. As explained by our supreme court,

> The Mechanics' Lien Statute provides a procedure for persons who perform labor or furnish materials or machinery for construction projects to establish and enforce a lien on the structure on which they have worked or for which they have furnished materials or machinery and on the interest of the owner of the land on which the structure stands or with which it is connected to the extent of the value of the work performed and material furnished.

*Mercantile Nat'l Bank of Ind. v. First Builders of Ind., Inc.*, 774 N.E.2d 490 (Ind. 2002). Whereas the PLN Statute

> provides a procedure for subcontractors, workers employed by others, and persons who lease materials or machinery for construction projects to establish liability on the part of the owner of the project for the amount owed to such subcontractors, workers, and persons by their respective contractors, employers, and lessees.

*Id*. A subcontractor's rights under the PLN Statute are viewed as an additional or alternative remedy to the subcontractor's rights under the mechanic's lien statute and to any other remedies the subcontractor may have against its

contractor. *Id*. at 488; *see also Lee & Mayfield, Inc. v. Lykowski House Moving Eng'rs, Inc.*, 489 N.E.2d 603 (Ind. Ct. App. 1986), *trans. denied*. "In Indiana the mechanic's lien statutes are in derogation of the common law and the provisions of such statutes which relate to the creation, existence or class of individuals entitled to such a lien are to be strictly construed. On the other hand, *once the lien has attached*, provisions relating to the enforcement should be liberally construed to effect the remedial purposes of the statute." *Edwards v. Bethlehem Steel Corp.*, 517 N.E.2d 430, 432 (Ind. Ct. App. 1988) (emphasis added).

[50] Because the PLN statute is a "purely statutory creation[] and [is] in derogation of common law, the[] provisions must be strictly construed." *Mid America Homes, Inc., v. Horn*, 396 N.E.2d 879, 881 (Ind. 1979). This is because courts will assume that "the legislature does not intend by a statute to make any change in the common law beyond what it declares either in express terms or by unmistakable implication." *L.N.K. ex. Rel. Kavanaugh v. St. Mary's Medical Center*, 785 N.E.2d 303, 307 (Ind. Ct. App. 2003). As the PLN statute imposes in essence a garnishment before either party can look to the courts for certainty regarding their respective obligations, continuing to resort to a bright-line test that enables all parties to ascertain whether the claimed PLN will be given effect is preferred over a regime where an owner must give its best guess as to any substantial compliance with the statute in order for an amount to withhold at peril to the progress of the project and the owner's legal exposure to its general contractor.

[51] Even if we were to construe the PLN statute as requested by Luse and were to employ a substantial compliance interpretation—which we are not—Luse would still not prevail. The undisputed evidence before the court reveals that Luse made no attempt, substantial or otherwise, to convey its intention in the June 1, 2020 email to hold BP personally liable for Graycor's financial obligations to Luse. Rather, the email reads as a follow-up to BP's inquiry, without any other intent than being of an informative nature. Accordingly, we affirm the trial court's grant of summary judgment in favor of BP on Luse's contention pursuant to the PLN statute.

VI. *Unjust Enrichment with respect to BP*

[52] As with its claims against Graycor, Luse also sought recovery of payment from BP for services rendered to improve BP's property under the theory of unjust enrichment. The trial court granted BP's motion for summary judgment on this claim, concluding, as a matter of law, that "[t]he existence of an express contract between Luse and Graycor preclude[d] a claim for unjust enrichment." (Appellant's App. Vol. II, p. 23).

[53] In the typical owner-general contractor-subcontractor relationship, "the parties have voluntarily allocated the risks by contract, and the failure of the general contractor to perform does not generally give rise to an action for unjust enrichment against the owner." *Indianapolis Raceway Park, Inc. v. Curtiss*, 386 N.E.2d 724, 726 (Ind. Ct. App. 1979); *see also Encore Hotels of Columbus, LLC v. Preferred Fire Prot.*, 765 N.E.2d 658, 661 (Ind. Ct. App. 2002). However,

Indiana courts have used the following four criteria to determine whether an owner has been unjustly enriched under those circumstances: 1) whether the owner impliedly requested the subcontractor to do the work; 2) whether the owner reasonably expected to pay the subcontractor, or the subcontractor reasonably expected to be paid by the owner; 3) whether there was an actual wrong perpetrated by the owner; and 4) whether the owner's conduct was so active and instrumental that the owner "stepped into the shoes" of the contractor. *Stafford v. Barnard Lumber Co., Inc.*, 531 N.E.2d 202, 204 (Ind. 1988); *Indianapolis Raceway Park, Inc.*, 386 N.E.2d at 727.

[54] In light of the factual posture of this case, there are no genuine issues of material fact regarding at least two of the criteria necessary to assert a claim for unjust enrichment. First, BP never expressly or impliedly promised to pay Luse for work performed, and Luse never reasonably expected to be paid by BP. Second, BP did not perpetrate an actual wrong on Luse. Instead, BP paid the balance in full to Graycor and had no reason to believe that Graycor would fail to pay Luse. Both BP and Graycor designated unequivocal evidence that BP paid in full and BP provided the trial court with a detailed accounting of every penny paid to Graycor under the main contract between BP and Graycor.

[55] While Luse repeatedly in its appellate brief represents that there is a dispute between BP and Graycor as to whether Graycor was fully paid, Luse's contention is in essence an argument related to the manner in which Graycor decided to allocate BP's payments among the subcontractors and itself—a matter which is squarely addressed by the terms of the Subcontract and which

thus precludes any claim of unjust enrichment by BP.[3]  Accordingly, the trial court did not err when it refused to apply the doctrine of unjust enrichment and properly granted summary judgment to BP.

## Luse's Motion for Partial Summary Judgment

VII. *Reimbursement for Additional Costs*

[56]   On February 4, 2021, Graycor filed a response pleading which included a counterclaim against Luse in the amount of $2,681,829.  This counterclaim encompassed the amounts for (1) various staffing, scaffolding, and support costs Gaycor incurred on the Project beyond March 1, 2020, and (2) $1million in liquidated damages which Graycor claimed were owed because Luse had offered to complete its work by January 31, 2020, and timely completion would have avoided the liquidated damages which BP levied against Graycor.  Luse moved for summary judgment on Graycor's counterclaim, arguing that the liquidated damages were not recoverable because Luse had not agreed to pay liquidated damages and that Graycor failed to present any evidence that Luse had a contractual duty to complete the work by January 31, 2020 or March 1, 2020.  The trial court granted summary judgment to Luse with respect to the

---

[3] Without any references to designated evidence, Luse argues that "[r]egardless of reasoning or cause, there is a factual dispute between Graycor and BP of what BP paid to Graycor for Luse's services that will need to be determined by a trier of fact."  (Appellant's Br. p. 67).  Luse claims that "[w]hile the three settlement agreements between Graycor and BP collectively resulted in an additional $29 million being paid to Graycor for work performed on the Project, none of the settlement agreements identify which costs were paid as part of those settlement agreements."  (Appellant's Br. p. 67, n.20).

liquidated damages, finding that no evidence had been designated to show that Luse had agreed to liquidated damages[4] but denied summary judgment with respect to the additional costs claimed by Graycor because there was enough evidence "however thin" to raise a factual question. (Appellant's App. Vol. II, p. 26).

[57] Pointing to Article 4.12 of the Subcontract, Graycor contended that Luse should be required to reimburse Graycor for the salaries Graycor continued to pay to its Project personnel as well as the amounts paid for scaffolding, transportation, and other support craft costs from March 1, 2020 to "the end of the [P]roject" as a result of Luse's alleged delays in performance because Luse breached its "original promise to complete in a three-month time frame." (Appellant's App. Vol. IX, p. 110). Article 4.12 of the Subcontract requires Luse to compensate Graycor for costs, expenses, and damages if the progress of the work was delayed by Luse, and provides specifically that:

> Should the progress of the Work or the Project be *delayed by any fault of the Subcontractor*, or by those for whose conduct the Subcontractor is responsible, so as to cause any additional cost, expense, damage or liability to the Contractor or the Owner or for which the Contractor or the Owner may or shall become liable, the Subcontractor agrees to reimburse, upon demand, the Contractor and the Owner for all such costs, expenses, damages and liability, including without limitation, legal fees and expenses, incurred by them, *to the extent caused or contributed to by*

---

[4] The parties do not appeal the trial court's summary judgment in favor of Luse with respect to Graycor's liquidated damages claim.

*the Subcontractor's fault* or the fault of those for whose conduct the Subcontractor is responsible.

(Appellant's App. Vol. III, p. 25) (emphasis added). In other words, in order for Graycor to receive reimbursement for these costs, the evidence must establish (1) a delay, (2) caused by Luse's fault, and (3) costs were incurred as a result of Luse's fault.

[58] Although Luse's own claim document indicates that the anticipated pipe insulation schedule was seventeen weeks and would be scheduled to be complete by September 1, 2019, there is no designated evidence that the schedule was pushed back to August 2020 by a delay specifically caused by Luse's fault. Similarly, although Graycor contends, without any reference to designated evidence, that there is "ample evidence that the reason Graycor staff, support crafts, equipment rental, and scaffolding were still on the [P]roject site from March 2020 until Luse's complete date in August was a result of Luse still not being finished with its work," Grayor is silent as to whether the extended August completion date was due to Luse's fault or was a result of the several delays which had been incurred since the inception of the Project. (Appellee Graycor's Br. p. 37). Likewise, Graycor's contention that "electricians could not perform work and scaffolding remained on site as a result of Luse's extended presence at the work site," merely indicated a revised completion date without establishing whether this is the result of Luse's fault. (Appellee Graycor's Br. p. 38). While it is uncontroverted that the Project incurred delays, it is unclear whether the delay which made Graycor incur

additional charges on the Project was the result of a fault by Luse or was merely the extension of delays incurred since the inception of the Project. Therefore, as we agree with the trial court that there remain genuine issues of material fact, we deny Luse's motion for partial summary judgment on Graycor's counterclaim and remand for further proceedings.[5]

## Appellate Attorney Fees

[59] Pointing to its favorable ruling on summary judgment, Graycor requests this court to remand to the trial court for an award of reasonable appellate attorney fees, as provided for in the Subcontract. Article 10.2 provides, in pertinent part, that "[i]n the event of any litigation or arbitration permitted under this Subcontract, the court or arbitrator shall award to the prevailing party its attorney's fees and costs in presenting or defending the Controversy." Graycor contends that because it "obtained a judgment in its favor on the merits of Luse's claim, it is the prevailing party on that claim and is entitled to its attorneys' fees and costs." (Appellee Graycor's Br. p. 34).

[60] We have previously held that when a contract provision provides that attorney fees are recoverable, appellate attorney fees may also be awarded. *Humphries v.*

---

[5] In its appellate brief, Luse also contends that in case we affirm the trial court's finding of partial summary judgment on Luse's motion, we should reverse the trial court's ruling as to the scaffolding costs which "the designated evidence proved were never actually incurred by Graycor." (Appellant's Br. pp. 75-76). We refrain from addressing this contention as Luse's entire argument is based on designated evidence which was stricken and is therefore not properly before this court. *AKJ Indus. V. Mercantile Nat'l Bank*, 779 N.E.2d 543, 545 (Ind. Ct. App. 2002) ("We will not consider evidence that has previously been stricken by the trial court to reverse that trial court's ruling on a motion for summary judgment.").

*Ables,* 789 N.E.2d 1025, 1036 (Ind. Ct. App. 2003). In this case, the Subcontract awards reasonable attorney fees to the 'prevailing party.' In *Reuille v. E.E. Brandenberger Constr. Inc.*, 888 N.E.2d 770, 771 (Ind. 2008) (quoting Black's Law Dictionary 1188 (6th ed. 1990)), our Indiana Supreme Court explained that the "prevailing party" is "'[t]he party to a suit who successfully prosecutes the action or successfully defends against it, prevailing on the main issue, even though not necessarily to the extent of his original contention. The one in whose favor the decision or verdict is rendered and judgment entered.'" Our supreme court also observed that "[a] request for attorney fees almost by definition is not ripe for consideration until after the main event reaches an end. Entertaining such petitions post-judgment is virtually the norm." *R.L. Turner Corp. v. Town of Brownsburg*, 963 N.E.2d 453, 460 (Ind. 2012).

[61] Although several claims between Graycor and Luse were resolved by way of summary judgment, there are still several claims outstanding in this Cause. Because this litigation has not yet been finalized, it is premature to determine the 'prevailing party' in this suit. As this issue is not yet ripe for our review, we decline to address Graycor's request for an award of appellate attorney fees.

## CONCLUSION

[62] Based on the foregoing, we hold that the trial court did not abuse its discretion in granting BP's and Graycor's motions to strike. We also affirm the trial court's partial summary judgment in favor of Graycor and the summary judgment in favor of BP. We affirm the trial court's denial of Luse's motion for

partial summary judgment, as genuine issues of material fact remain. Finally, we find Graycor's request for appellate attorney fees not ripe for our review.

Affirmed.

Crone, J. and Mathias, J. concur